GLENWILLOW LANDFILL, INC., et al., Plaintiffs,

v.

CITY OF AKRON, OHIO, et al., Defendants.

HYBUD EQUIPMENT CORPORATION et al., Plaintiffs,

v.

CITY OF AKRON, OHIO, et al., Defendants.

Civ. A. Nos. C78–65A, C78–1733A.

United States District Court, N. D. Ohio, E. D.

Dec. 19, 1979.

William C. Brashares, Steven R. Schaars, Washington, D. C., Joseph E. Abdenour, John L. Wolfe, Akron, Ohio, Francis X. Beytagh, Toledo, Ohio, for plaintiffs.

James L. Bickett, Akron, Ohio, Eben G. Crawford, William H. Baughman, Jr., Cleveland, Ohio, Steven J. Schwartz, Asst. Pros. Atty., Akron, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

In December 1976, the City of Akron, Summit County, and the Ohio Water Development Authority (OWDA) entered into a cooperative agreement to enable the OWDA to sell $46,000,000 worth of revenue bonds so the City could develop a recycle energy system. To fulfill its obligations under the agreement, the City enacted Ordinance No. 846–1976. The plaintiffs in these two cases allege that certain covenants of the cooperative agreement and the ordinance are illegal because: they deprive plaintiffs of due process of law under the fourteenth amendment;[1] they take property in violation of the fifth amendment to the United States Constitution as applied to the states through the fourteenth amendment; they restrain interstate commerce in violation of Article I, section 8 of the Constitution; they violate Article 18, section 3 of the Ohio Constitution; and they violate sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. The plaintiffs seek declara-

---

1. Although the complaint alleges a claim based on the equal protection clause of the fourteenth amendment to the United States Constitution, that claim has not been discussed by the plaintiffs in any of their briefs to this Court.

tory and injunctive relief, and an award of attorney's fees.

The Court has jurisdiction of the action under 28 U.S.C. §§ 1331, 1337 and 2201. The parties ask the Court to exercise pendent jurisdiction over the state law claim. Venue is proper in this district under 28 U.S.C. § 1391(b), 15 U.S.C. §§ 15, 22. The Court duly heard testimony and received exhibits on May 14, 15, 16, 17, and 18, 1979. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

## I. FACTS

The parties have stipulated to the great proportion of the relevant facts.[2] Paragraphs 1 through 50 and 90 through 92 of the pre-trial stipulation are incorporated herein as Appendix A. The remaining portion of the stipulation, paragraphs 51 through 89 and part of paragraph 5, is incorporated herein as Appendix B.[3] The stipulation entered into at trial, paragraphs 4 through 13 of the Ohio Water Development Authority's proposed findings of fact, is incorporated herein as Appendix C. In addition the Court finds the following facts:[4]

1. The city built the RES to solve its solid waste disposal problem. A number of factors, including Ohio Edison's desire to stop generating steam for the downtown business district, caused the city to decide the RES was the best alternative available to solve the waste disposal problem.

2. The underwriters decided it was necessary to assure a supply of waste to the RES in order to market the revenue bonds. After learning this the city and the OWDA concluded that it would be necessary to require that all waste collected within the city limits would be taken to the RES.

### A. Sherman Act

■ When both constitutional and statutory violations are alleged it is preferable for the Court to consider the statutory questions first, thus avoiding advisory opinions on constitutional issues if possible. *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This Court will, therefore, first consider the alleged antitrust violations.

Initially the Court must consider whether the plaintiffs have standing to challenge the covenants and the ordinance on antitrust grounds. The defendants argue that the plaintiffs lack standing to attack the legality of the covenants because the covenants by themselves have no force or effect and cause the plaintiffs no injury in fact. See *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). But the plaintiffs' antitrust claims include allegations of conspiracy.

■ Under the Sherman Act an agreement in restraint of trade is illegal. Proof of the actual effect on commerce caused by

2. The parties also put 36 depositions into evidence by stipulation. Two of the depositions, those of Ned Oberlin and Richard Bain, were never filed with the Court and are therefore not part of the evidence considered.

3. Appendix B shall remain under seal as it contains confidential information that is subject to a protective order entered by the Court.

4. The plaintiffs have moved the Court to reconsider an evidentiary ruling made during the course of trial and have asked the Court to admit portions of the deposition of Kenneth Sheperd and several related exhibits into evidence. The Court declines to alter its prior ruling that the evidence should be excluded under Rule 408, Federal Rules of Evidence, as

part of a proposed compromise to end the present litigation. The plaintiff has tried to show that the defendants failed to object to the discovery of these matters and thus waived their right to object to its admissibility, but questions of admissibility—unlike matters of privilege—are not so waived. See Wright & Miller, Federal Practice & Procedure § 2156. Accordingly, the motion for reconsideration is hereby denied. Alternatively, the Court finds that if the deposition and exhibits were held admissible to show bias and prejudice as permitted under Rule 408, the additional evidence would not cause the court to alter any of its findings of fact.

the conspiracy is not always required to establish a violation of the statute. *E. g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The cooperative agreement is arguably evidence of an illegal conspiracy in restraint of trade which may be illegal under the Sherman Act without proof of its actual effects. Therefore the Court does not believe that the plaintiffs must show injury in fact caused by the covenants to raise the Sherman Act claims. Furthermore, the enforcement of the ordinance will subject the plaintiffs who collect solid waste within the city to potential criminal penalties if they violate its terms. If injury in fact was a requirement to assert the Sherman Act claims the waste collectors would still have standing to challenge the defendants' agreement under the Sherman Act: they were injured by the ordinance that was enacted pursuant to the covenants of the cooperative agreement.[5]

▮ Regarding the substance of the plaintiffs' antitrust claims, the defendants argue that their conduct is exempt from the operation of the Sherman Act under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. In *Parker* a California raisin grower challenged the California prorate program under the Sherman Act.[6] The Supreme Court assumed that the program would violate the Sherman Act if it was organized and made effective solely by an agreement between private parties. The act, however, derived its force and effect from the legislative command of the state. The Supreme Court found

> nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* at 350–51, 63 S.Ct. at 313. Thus, the Court decided that the administration of the California act was not covered by the Sherman Act.

The defendants argue that their conduct is similarly protected for two reasons, first because of the powers granted to the OWDA which make it the state agency with power over waste disposal facilities, and second because of the home-rule powers granted to the City of Akron under state law.

Section 6121.02 of the Ohio Revised Code creates the OWDA.[7] The OWDA's powers with respect to waste disposal facilities are set out in section 6123.03 of the Ohio Revised Code:

> It is hereby declared to be the public policy of the state through the operations of the Ohio water development authority . . . to provide for the comfort,

---

5. In declaratory judgment actions it is often necessary for the court to examine another facet of the case or controversy requirement and to determine whether the dispute is ripe for adjudication. The parties do not question, and the Court finds no reason to doubt the ripeness of the instant dispute. See *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). *Cf. Andrus v. Allard,* —— U.S. ——, —— n.21, 100 S.Ct. 318, 326 n.21, 62 L.Ed.2d 210 (1979) ("All appellees, however, may face future criminal prosecutions for violations of the statutes, and that, of itself suffices to give them standing to litigate their interest in the construction of the statutes.")

6. The California Agricultural Prorate Act authorized the establishment of programs for the marketing of agricultural commodities produced in the state, to restrict competition among the growers and maintain prices in the distribution of their commodities to packers. The program was administered by a commission of nine persons, eight members appointed by the governor and confirmed by the senate, and the ninth, an *ex officio* member, the state's director of agriculture. 317 U.S. at 346, 63 S.Ct. 307.

7. The OWDA is made up of eight members. Five are appointed by the governor with the advice and consent of the senate; the state's directors of natural resources, environmental protection, and energy are *ex officio* members. § 6121.02, Ohio Revised Code.

health, safety, and general welfare of all employees and other inhabitants of the state and for the conservation of the land, air and water resources of the state through efficient and proper methods of disposal salvage and reuse of or recovery of resources from solid wastes thereby eliminating or decreasing accident and health hazards including rodent and insect sectors of disease, public nuisance and the adverse effect on land values caused thereby and the scenic blight marring the landscape, [and] to assist in the financing of solid waste facilities . . . In furtherance of such public policy, the Ohio water development authority . . may make loans and grants to governmental agencies for the acquisition or construction of solid waste facilities by such governmental agencies . . . and may issue solid waste revenue bonds of this state payable solely from revenues, to pay the cost of such projects.

The defendants contend that the powers granted to the OWDA within its sphere of authority are comparable to the power granted to the Supreme Court of Arizona over the practice of law, and that their actions should be accorded the immunity recognized in *Bates v. State Bar of Arizona,* 433 U.S. 350, 359–63, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

In *Bates* the Supreme Court held that enforcement of the state supreme court's disciplinary rule which prohibited attorneys from advertising in newspapers and other media was exempt from the Sherman Act under the doctrine of *Parker v. Brown, supra.* The Court isolated three factors in reaching its conclusion. First, the Court noted that the defendant in *Bates* was the state and not a private party.[8] Second, the Court found that the state of Arizona had an interest in protecting the public that was

intimately connected to its regulation of the activities of the bar. Finally, the Court saw in the disciplinary rules a clear articulation of the state's policy with regard to professional behavior, and active supervision and review of the state policy by the responsible state agency. 433 U.S. 361–62, 97 S.Ct. 2691.

The Court will assume *arguendo* that if private parties entered into the covenants contained in the cooperative agreement and attempted to carry out the terms of the challenged ordinance their actions would violate the Sherman Act. Examining the factors outlined by the Supreme Court in *Bates,* the Court first finds the OWDA is a state agency and that its power to determine state policy concerning the issuance of state revenue bonds for facilities like the RES is supreme. Second, the Court determines that the state has a legitimate interest in promoting safe and sanitary methods of solid waste disposal; the state's concerns, and their relationship to the health and welfare of the people of Ohio, are explained in section 6123.03 of the Ohio Revised Code. The state also has a legitimate interest in giving financial aid to its subdivisions to establish projects that serve these goals without harm to the state's treasury; thus the OWDA's concern for the viability of the RES revenue bonds is a legitimate state concern. See *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (recognizing the importance of financial considerations in structuring local government services).

Finally, the statutes creating the OWDA and establishing its powers clearly articulate the state's policies. The OWDA actively participated in drafting the covenants of the cooperative agreement, and thus played a major role in creating the challenged ordi-

---

**8.** In *Bates,* the state supreme court had promulgated the regulation in question, and the state supreme court was the state agency responsible for overseeing the activities of the bar. This situation can be contrasted with *Goldfarb v. Virginia State Bar Association,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), where the county bar association and the state bar association had adopted minimum fee schedules.

Neither of the bar associations was the state agency responsible for regulating the bar, and the responsible agency—the state supreme court—had not adopted or enforced the fee schedules, and was not named as a defendant. The Court therefore found that state action was not involved and the *Parker* exemption did not apply. In *Bates* the state was a party through its agent, the state supreme court.

nance which was in all material respects set out in the covenants.[9] In doing this the OWDA was acting for the state under express statutory authority to further the state policies declared in section 6123.03 of the Ohio Revised Code. See also Ohio Revised Code §§ 6123.04, 6123.13 (further describing the powers of the OWDA). The Court concludes that the powers of the OWDA within its sphere of authority are comparable to those of the state agencies examined in *Bates* and *Parker*, and that its activities are outside the reach of the Sherman Act.

The defendants also argue that the city is a subdivision of the state exercising sovereign powers, and that the city's enforcement of the challenged ordinance is within the *Parker v. Brown* exemption. The home-rule powers granted to charter cities under the Ohio Constitution are sufficient, in the defendants' view, to give them sovereignty equal to that of the state within their borders. The plaintiffs respond that the Supreme Court has held that the activities of the city of Lafayette, Louisiana are outside the *Parker v. Brown* exemption, and that cities in Ohio should not be treated differently solely on the basis of home-rule powers established by state law, citing *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

The Court in *City of Lafayette* held that a municipal light plant was not within the *Parker v. Brown* exemption when it was competing with other power companies in areas outside the city limits. The Justices who found Lafayette's activities were not exempt recognized nonetheless that in some situations municipalities may exercise the sovereign powers of the state.

The home-rule powers given to municipalities under the Ohio Constitution authorize charter cities to establish governmental policy within their corporate limits to the extent that the legislature has not set a uniform state policy. Ohio Const. Art. XVIII, § 3. In other words, in the language of *Bates*, the Ohio Constitution declares that cities act as agents of the state when they exercise governmental powers within their city limits. The Ohio Constitution grants these powers in broad terms, and does not explicitly define the scope of a city's power to regulate competition in the sphere of solid waste disposal. Rather than declare a state-wide policy to be implemented by state or local authorities, Ohio's waste disposal policy is to permit local authorities to declare the policy that will control within their borders. The Ohio courts have recognized that local governments are responsible for regulating the collection and disposal of solid waste within their borders—by monopoly if the city finds it appropriate. See *State ex rel. Moock v. Cincinnati*, 120 Ohio St. 500, 166 N.E. 583 (1929); *City of Canton v. Van Voorhis*, 61 Ohio App. 419, 22 N.E.2d 651 (1939).

The plaintiffs argue that the intent to displace competition must be more clearly enunciated by the state. In *City of Lafayette* the plurality opinion[10] approved the Fifth Circuit's understanding of *Parker*, saying a state mandate to displace competition is present "when it is found 'from the authority given a governmental entity to operate in a particular area that the legislature contemplated the kind of action complained of.'" 435 U.S. 415, 98 S.Ct. 1138 (citations omitted). The plurality expressly recognized: "Today's decision does not threaten the legitimate exercise of governmental power, nor does it preclude municipal government from providing services on a monopoly basis." 435 U.S. 416–17, 98

---

9. The plaintiffs emphasize the role the underwriters played in establishing the need for the ordinance. The underwriters were hired by the OWDA to market the bonds. The fact that the OWDA and the city relied in part on the underwriters' expertise in making their decision to support and enact the ordinance does not make it any less their decision.

10. That is, part III of Justice Brennan's opinion. Justices Marshall, Powell and Stevens joined in all three parts of Justice Brennan's opinion; Chief Justice Burger joined in part I of the opinion and in the judgment.

S.Ct. 1139.[11] Ohio has recognized that municipalities may choose to provide waste disposal services on a monopoly basis. Furthermore, the Third Circuit has said that the intent of the state to restrain competition in a particular area "may be demonstrated by explicit language in state statutes, *or may be inferred from the nature of the powers and duties given to a particular government entity.*" *Duke & Co. v. Foerster*, 521 F.2d 1277, 1280 (3d Cir. 1975) (emphasis added). In Ohio the state has delegated to local authorities the power to declare the policy that will control within their borders. The Court does not believe that the state's policy choice is entitled to less weight because it·has chosen diversity over homogeneity. This is particularly true in areas of traditional local concern such as the collection and sanitary disposal of solid waste which is the focus of the challenged ordinance.

The Court has thus found, for two alternative reasons, that the challenged activities are exempt from the operation of the Sherman Act. Having decided that the statutory claims will not determine the case, the Court must consider the constitutional issues raised by the plaintiffs.

### B. *Commerce Clause*

The plaintiffs claim that the ordinance impermissibly restricts interstate commerce in violation of the commerce clause, article I, section 8 of the United States Constitution. The commerce clause gives Congress the power to regulate commerce between the states. If there is no federal regulation preempting the field in a particular area,[12] the states are free to regulate so long as the restraints imposed do not transgress the terms of the commerce clause itself. The scope of permissible state regulation is not found in the words of the commerce clause; rather it has emerged gradually through judicial interpretation. See *Philadelphia v.*

*New Jersey*, 437 U.S. 617, 623, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

Before proceeding to consider the merits of the plaintiffs' commerce clause claim, the Court must consider whether the parties before it can properly raise these issues. As previously noted, for the plaintiffs to have standing to raise a claim they must assert that the challenged activity causes them injury in fact. *Warth, supra; Eastern Kentucky, supra.* The covenants do not impinge on the plaintiffs' activities in any way. Therefore the Court finds that the plaintiffs do not have standing to challenge the constitutionality of the covenants. The waste collectors will be subject to criminal prosecution if they fail to comply with the terms of the ordinance. They thus have standing to challenge the ordinance under the commerce clause. Because the commerce clause challenge attacks the ordinance on its face and not as applied to any particular plaintiffs, and since the plaintiffs seek only declaratory and injunctive relief, it is unnecessary to consider whether all of the plaintiffs have standing to challenge the constitutionality of the ordinance; a finding that the waste collectors have standing will be sufficient.

In evaluating an ordinance under the commerce clause the Court must ask: (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). See *Philadelphia v. New Jersey, supra*, 437 U.S. at

---

**11.** It is also worth noting that in *City of Lafayette* the anticompetitive activities all took place outside the city limits while the city was engaging in proprietary activity. Here, the plaintiffs challenge an ordinance that is effective only within the city limits and which was adopted to provide the city residents with safe and sanitary waste disposal.

**12.** Plaintiffs do not claim any preemption in this case. See *Philadelphia v. New Jersey*, 437 U.S. 617, 620-21 & n.4, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

624, 98 S.Ct. 2531; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The party challenging the legislation has the burden of showing the discrimination against interstate commerce that is the focus of the first inquiry. *Hughes, supra*, 99 S.Ct. at 1736.

■■■ The Akron ordinance affects only solid waste that is collected within the city; [13] thus it categorizes waste based on its geographic place of origin. Yet under the ordinance waste originating outside Ohio is not distinguished from Ohio waste originating outside the city limits. In *Hughes, Philadelphia*, and *Pike* the unconstitutional statutes drew lines along the state boundary. The Akron ordinance directly affects only intrastate activities, and any effect on interstate commerce is indirect. Nor do the plaintiffs argue that the ordinance restrains interstate commerce in solid waste. They argue that commerce is restrained in the recyclable materials that can be separated from the solid waste. Since the ordinance acts only on solid waste, any burden on interstate commerce in recyclable goods moving in interstate commerce is indirect and incidental.

The second inquiry for the Court under the commerce clause is whether the ordinance serves a legitimate local purpose. The Akron ordinance serves the legitimate goal of making it possible to build the RES and thus assures the safe and efficient disposal of solid waste generated within the city.[14]

Turning to the final inquiry, the Court finds that the plaintiffs have not shown that the city's goals could be served by legislation that would impose a smaller burden on interstate commerce. The plaintiffs do suggest that the city should attract waste to the RES by making it economically advantageous to use the RES. The city considered that possibility, but determined the ordinance was necessary.

As not one of the three parts of the test has been shown, the Court holds that the ordinance is not invalid under the commerce clause.

### C. Due Process

The plaintiffs raise two arguments under the due process clause of the fourteenth amendment. First they argue that the ordinance is not sufficiently related to legitimate governmental objectives to pass scrutiny under the due process clause of the fourteenth amendment. Second, they argue that if the ordinance does serve a legitimate public purpose, it effects a taking of their property for which they must be compensated as provided in the fifth amendment which is applied to the states through the fourteenth amendment.[15]

■■■ Plaintiffs' first argument under the due process clause asks the Court to subject the ordinance to substantive due process analysis: the Court is to determine whether the city's police power regulation has the appropriate and direct connection to the health, welfare, and safety of city residents. *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Patterson v. Kentucky*, 97 U.S. 501, 24 L.Ed. 1115 (1878). See *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). The defendants ar-

13. The plaintiffs argue that the ordinance is subject to two possible interpretations. Under the first construction all persons collecting waste that is generated within the city of Akron must obtain a license to collect waste and must take to the RES all waste material generated within the city that is deemed acceptable for disposal there. Under the second construction the collectors must take all waste generated within the city limits to the RES, and any collector transporting non-Akron waste over Akron streets, avenues, and alleys must take that waste to the RES as well. The Court finds that the language of the ordinance is suscepti-

ble only of the first construction, and the Court's analysis of the ordinance is based on this understanding.

14. The legitimate governmental purposes that support the city's determination to construct the RES are more fully described in conjunction with the Court's discussion of the due process claims, *infra* at 680.

15. Again the Court notes that the covenants cause the plaintiffs no injury in fact, and they therefore have no standing to challenge their constitutionality.

gue that the health, welfare, and safety of city residents were motivating factors behind the construction of the RES. Health and safety problems are a constant concern with landfill operations. Health and safety concerns also require that the city maintain a public disposal site to discourage unauthorized dumping of waste within the city limits. The defendants say also that the public welfare required the city to pursue an alternative to landfilling for waste disposal in the Akron area because of the increased difficulties encountered in locating and purchasing suitable landfill sites.

The plaintiffs emphasize the role played by a number of interested private parties: Teledyne, who will operate the RES and receive a portion of its profits (if any); Dillon Read, the firm that headed the underwriting team; Ohio Edison, with an old steam generating facility and downtown customers who need steam. Examining the intent of the council that enacted the city ordinance the plaintiffs stop with the explicit statement within the enactment:

WHEREAS, in connection with the financing of the City's recycle energy facility, it is necessary to provide for revised service charges for the collection and disposal of garbage and rubbish and to revise licensing provisions to require that garbage and rubbish collected by private haulers be disposed of at the new facility when completed.

The plaintiffs argue that the ordinance was enacted to promote narrow private financial interests, without a proper public purpose.

The Court finds that the plaintiffs' understanding of the legislative purpose is overly circumscribed and removes the ordinance from its proper context. As indicated by the whereas clause on which the plaintiffs rely, the ordinance cannot be separated from the RES. Likewise, the city's purpose in constructing, and in financing the construction of the RES cannot be separated from the ordinance. The cooperative agreement and the covenants further demonstrate this connection that plaintiffs attempt to deny.

The city's initial concern for a long term solution to the problem of safely and efficiently disposing of solid waste prompted it to explore recycling and incineration as possible solutions. Over time, as studies were being conducted and as various alternatives were being explored, many factors entered into the decisionmaking and caused the city to finally settle on the RES as the best available method for solving the local, solid waste disposal problem. The magnitude of the problems the city has encountered with landfilling and the chronology of events convince the Court that the city's motivation in building the RES and enacting the ordinance was not to advance private business interests or to undertake proprietary activity. The private interests and the private parties involved in financing and operating the RES do not negate the overriding public purposes and governmental concerns that caused the city to promote the RES and to pass the ordinance.

In *California Reduction Co. v. Sanitary Reduction Works*, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905), and *Gardner v. Michigan*, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905), the Supreme Court considered arguments that ordinances regulating garbage collection were unconstitutional deprivations of property. The Court held that the ordinances were valid exercises of the police power and that they did not unconstitutionally deprive the citizens of the several municipalities of their property. The plaintiffs in the instant case have tried to show themselves outside the rule of *California Reduction* and *Gardner* in several ways.

The waste collectors argue that their interest in the waste they collect is different from the interest in garbage asserted by the citizens of a municipality. Plaintiffs say that the ordinance takes something of value from the waste collectors and confers a corresponding benefit on the government. They argue that this attempted regulation must be distinguished from governmental regulation that acts evenhandedly on all citizens to control a nuisance. In this connection the plaintiffs emphasize the differences between the garbage that was being

regulated in 1905 and the solid waste and recyclable materials that are regulated by the Akron ordinance. The Court recognizes that there are materials of value within solid waste. It is likewise true that if solid waste is not properly disposed of it can create the same dangers to the public health, welfare, and safety as the garbage of 1905. Thus the Court concludes, as did the Supreme Court in *California Reduction,* that provisions to assure the proper disposal of waste "cannot be properly regarded . . . as a taking of private property for a public purpose, without compensation, simply because such garbage [or waste] may have had . . . some element of value." 199 U.S. at 323, 26 S.Ct. at 105. The Court finds that the ordinance is a regulation adopted to control a nuisance (or potential nuisance) that incidentally impacts on some collectors who separate materials of value from the waste they collect.

The plaintiffs do recognize that "[t]he public interest addressed by the RES is the need of the Akron community to have a satisfactory waste disposal facility." But, they say: "the RES does not address any perceived problem in the business activities of the Plaintiffs." If perceived problems in the business activities of the plaintiffs were the justification for the ordinance, then the lack of any perceived problem in their business activities would seem to be a matter for the Court's concern. The ordinance is, however, part of the city's broader scheme to dispose of waste in a safe and sanitary manner at the RES. The ordinance is a reasonable means to achieve this legitimate goal.

Citing *Moore v. City of East Cleveland, supra* the plaintiffs argue that the ordinance's relation to this broader public purpose is not sufficient to sustain it. They say that the ordinance must be subjected to a more rigorous scrutiny before the Court

can call it proper means to achieve a legitimate end. In *Moore* the Supreme Court invalidated a local zoning ordinance [16] explaining that:

> When a city undertakes such intrusive regulation of the family . . . ; the usual judicial deference to the legislature is inappropriate. "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." . . . Of course, the family is not beyond regulation. But when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.

431 U.S. at 499, 97 S.Ct. at 1936 (citations omitted). The plaintiffs have not shown that the ordinance interferes with their interests in a manner that is comparable to the intrusion into matters of personal and family choice that were at issue in *Moore*.[17] The "usual judicial deference to the legislature" is therefore appropriate.

Having found that there is a legitimate public purpose for the ordinance, the Court must address the plaintiffs' second argument under the fourteenth amendment, and determine whether the ordinance takes their property for a public purpose without affording them the just compensation required by the fifth amendment.

The plaintiff waste collectors argue that under Ohio law the waste they collect is abandoned property and that, once it is put in their trucks, they own the waste. Before the ordinance the collectors were always free to take their waste, i. e. their property, to any disposal site they chose. By mandating that they take the waste to the RES the

---

**16.** Mrs. Moore lived with one of her sons, his son, and another grandson; the two grandsons were first cousins. Because her household did not comply with the definition of family in the local zoning ordinance, Mrs. Moore was convicted of a criminal offense.

**17.** As discussed *infra* at 681–684 the Court finds the plaintiffs have not established that the ordinance interferes with any property interest protected by the Constitution. Plaintiffs have not attempted to show that the Akron ordinance interferes with any protected liberty interest.

waste collectors claim that the ordinance takes their property without giving them compensation.

■ The Court notes, however, that the collectors collect waste within the city of Akron only after they have obtained a license to do so. Under the ordinance the city will not seize the waste that is now in the trucks nor the waste in the transfer station. The city is regulating where the waste may be taken for disposal. Before the effective date of the ordinance the collectors are free to choose from among several disposal sites. The ordinance removes that choice, and collectors who continue to collect solid waste in Akron while the ordinance is in force will have to abide by its terms. The ordinance takes from the waste collectors the expectation that they would always be able to take the waste they collected within the city to a disposal site of their choice. The plaintiffs have not shown that this is a property right requiring protection under the fifth amendment.

■ Property rights that are protected by the federal constitution are defined by reference state law or common law. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The plaintiffs rely on a series of state court cases where the courts found that regulations similar to the ordinance at issue here impermissibly interfered with the property rights of landfill owners. *Parker v. Provo City*, 543 P.2d 769 (Utah 1975); *Acme Disposal Corp. v. Southeast Berrien County Landfill Authority*, Case No. 75–2130–CE (Mich.Ct.App. Oct. 23, 1975); *Thompson v. County of Blue Earth*, No. 37447 (Fifth Judicial District, County Of Blue Earth, (1974), *aff'd*, 305 Minn. 438, 233 N.W.2d 770 (1975). Those courts, did not, however, describe the property interest they found it necessary to protect, nor did they offer analysis to support their result. This Court finds them unpersuasive. The plaintiffs have also failed to explain what property interest of the waste collectors this Court should protect based on those authorities.

In the procedural due process context, the Supreme Court has recognized that actions of governmental entities can foster expectations that may ripen into property rights. In *Board of Regents of State Colleges, supra,* an assistant professor at a state university challenged the university's decision not to rehire him for another year claiming he had not been given the procedural due process to which he was entitled. The Court found that he had been teaching under a one year employment contract, and there were no statutory or administrative standards defining eligibility for reemployment. The Court held that the teacher had not shown any property or liberty interest that was infringed when he was not given a new contract. Considering a similar due process challenge by another teacher in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court found that the teacher, whose contract was not renewed, had alleged facts that raised a genuine issue as to his interest in continued employment at the college. The teacher's reliance on a *de facto* tenure program described in official policy statements issued by the college suggested a possible property interest in continued employment. The plaintiffs have not shown that the waste collectors' expectations were fostered by any official statement. The Court does not find that the expectations are a legitimate claim of entitlement that requires the protection of the fifth amendment.

■ The landfill operators and Budoff Iron and Metal, which operates the transfer station, have shown that the ordinance causes them injury by forcing solid waste to the RES that would otherwise come to them, depriving them of tipping fees and recyclable materials. These plaintiffs therefore have standing to challenge the ordinance.[18] As they may have property interests that are protected by the fifth amendment in situations where the waste

---

18. For the other constitutional claims previously examined the arguments raised by the waste collectors were no different from the arguments of the landfill operators. Thus, it has been unnecessary until this point to examine the standing of the landfill operators.

collectors do not, it is necessary to examine their fifth amendment claims separately.

These plaintiffs rely on the same series of state court cases that the Court has already determined to be unpersuasive. The transfer station and the landfills merely had the expectation that the waste collectors would continue to bring waste from the city of Akron to them for disposal. They have not shown that this expectation rises to the level of a legitimate claim of entitlement or other property interest protected by the fifth amendment.

■ Alternatively, accepting the argument of the waste collectors that the ordinance impacts on their ability to dispose of the waste they collect which is part of the traditional property concept of ownership, the Court finds nonetheless that this is not a compensable taking under the fifth amendment.

In zoning cases where governmental regulation affects real property interests it is well established that reasonable restrictions imposed for the health, welfare, and safety of the population are not unconstitutional deprivations of property; rather, they have been held to be legitimate exercises of the police power. *E. g., Village of Euclid v. Ambler Realty*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Similarly, in *Andrus v. Allard*, —— U.S. ——, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Supreme Court held

that a regulation prohibiting the sale of artifacts containing eagle feathers was not a taking for which compensation was required. The Court said that "governmental regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or exploitation of private property." *Id.* at ——, 100 S.Ct. at 327.[19] In considering the plaintiffs' first claim under the due process clause the Court has determined that the ordinance is a proper exercise of the city's police powers. The Court likewise concludes that the ordinance is not a taking for which compensation must be paid under the fifth amendment.

## D. State Constitutional Claim

■ The plaintiffs' final claim is that the ordinance violates the state constitution. Article XVIII, section 3 of the Ohio Constitution provides:

Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.

The plaintiffs' position is that the extraterritorial effects of the ordinance are so extensive that the ordinance effectively regulates matters outside the city limits and violates this constitutional provision.

Plaintiffs rely on a Minnesota case, *Thompson v. County of Blue Earth, supra,*

19. Having noted that "[t]here is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate" the Supreme Court analyzed the regulation at issue:

The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking because the aggregate must be viewed in its entirety. In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.

*Id.* (citations omitted). The plaintiff waste collectors may argue that more than one strand has been taken from their bundle: they do not have the right to donate or devise the waste they collect and the Akron ordinance does therefore accomplish a taking for which compensation must be paid. Analogizing to the zoning context, the Court finds that the owners of the eaglefeather artifacts are in the posture of a property owner with a nonconforming use. In contrast, the waste collectors who chose to pay for a waste collection license in Akron when the ordinance is in effect are in a posture comparable to a new owner who has purchased a home subject to the zoning ordinance. The ordinance restricts the waste collectors, but it is not a taking.

saying that the Ohio courts would reach a similar result and invalidate the local ordinance under the state constitution. As is apparent from the plaintiffs' brief, however, the Minnesota court was interpreting the due process clause of the state constitution. The Ohio constitutional provision at issue here is very different.

The Ohio case of *City of Canton v. Whitman*, 44 Ohio St.2d 62, 337 N.E.2d 766 (1975), is likewise inapposite because that case presented a clash between the uniform state policy of the state environmental protection agency, which required fluoridation, and the city's decision not to add fluorides to the city water supply. Here there is no similar clash. Akron's ordinance was in fact supported by the OWDA, the state agency responsible to promote waste disposal facilities.

The Court finds that the Akron ordinance regulates waste collection and disposal within the city limits and is a proper exercise of the city's home rule powers under the Ohio Constitution.

### E. *Conclusion*

Having found that the activities of the defendants are exempt from the Sherman Act under the doctrine of *Parker v. Brown*, that the ordinance does not violate the commerce clause, or the fourteenth amendment to the United States Constitution, and that the ordinance is not in violation of Article XVIII section 3 of the Ohio Constitution, the Court concludes that judgment shall be entered for the defendants and against the plaintiffs on all claims.

IT IS SO ORDERED.

### APPENDIX A

#### *Jurisdiction and Venue*

1. All defendants admit the jurisdictional allegations of the consolidated complaints except that OWDA denies the jurisdictional basis for plaintiffs' 42 U.S.C. § 1983 claim against it.

2. Venue is proper in this district by virtue of 28 U.S.C. Section 1391(b), 15 U.S.C. Section 15, and 15 U.S.C. Section 22. All defendants either inhabit, transact business, reside or are found in this district and all claims asserted have arisen in this district.

#### *The Plaintiffs*

3. Plaintiff Glenwillow Landfill Inc. (hereinafter "Glenwillow") is a private corporation organized and existing under the laws of the State of Ohio. Plaintiff Portage Landfill Inc. (hereinafter "Portage") is a sole proprietorship. Plaintiffs Glenwillow and Portage operate sanitary landfill disposal sites located in the Counties of Cuyahoga and Portage, Ohio, respectively. These disposal sites, which are licensed pursuant to Ohio Revised Code, Chapter 3734, are open to the public for the disposal of solid waste materials. Parties depositing waste materials at Glenwillow and Portage disposal sites pay said plaintiffs a fee based on the quantity of waste deposited. Accordingly, a significant portion of the income derived by said plaintiffs from the operation of their disposal sites is attributable to the deposit of solid waste materials. As of June 1, 1978, Glenwillow maintained a tipping charge of approximately $4 to $5 per ton. As of January 1, 1978, Portage maintained a tipping charge of approximately $4.40 per ton.

4. Plaintiff J. R. Hawley Sanitation, Inc. (hereinafter "Hawley") is a private corporation organized and existing under the laws of the State of Ohio. Plaintiff Kovach Sanitation (hereinafter "Kovach") is a sole proprietorship. Plaintiffs Hawley and Kovach are haulers of waste material, licensed by the City of Akron, Ohio, and own and operate waste collection vehicles, waste containers and related waste collection equipment in the City of Akron, Ohio, in Summit County outside the City and in areas outside the County. Under the terms of various agreements between said plaintiffs and certain industrial and commercial concerns situated within and outside the City of Akron, Ohio, said plaintiffs covenant to remove the waste materials generated by said concerns, in return for which said plaintiffs receive a fee, based on the quantity of waste removed therefrom.

5. Plaintiff Hybud Equipment Corp. (hereinafter "Hybud") is a private corporation organized and existing under the laws of the State of Ohio and is a hauler of waste material, licensed by the City of Akron and other jurisdictions in which it operates which require licenses. Hybud owns and operates waste collections vehicles, waste containers and related waste collection equipment in the City of Akron and County of Summit, Ohio, and in several contiguous counties in Ohio. Under the terms of various agreements between said plaintiff and certain industrial and commercial concerns situated within the City of Akron and County of Summit, Ohio, and in contiguous counties in Ohio, said plaintiff covenants to remove the waste materials generated by said concerns, in return for which said plaintiff receives a fee, based on the quantity of waste removed therefrom. Plaintiff Hybud also designs and manufactures solid waste containers and compactors and other types of waste handling equipment, some of which it places or leases at the location of its customers in and outside the City of Akron and the remainder of which it sells to third parties. Plaintiff Hybud has also sold bags for containment of solid waste to its customers and to others from time to time. . . .

6. Plaintiffs Hawley, Kovach and Hybud presently operate some collection routes in which solid waste collected in the City is mixed in the same trucks with waste collected outside the City.

7. Plaintiff Budoff Iron and Metal Corp. (hereinafter "Budoff") is a private corporation organized and existing under the laws of the State of Ohio. Said plaintiff owns and operates a transfer station within the City limits of Akron, Ohio. Budoff (a) receives at the transfer station "source segregated" cardboard and waste materials containing recoverable cardboard and metal, most of which is collected by plaintiff Hybud in Akron, Summit County and contiguous counties in Ohio; (b) removes therefrom cardboard and metals, (c) sells such recovered materials to paper and scrap metals dealers (or other customers) and (d) disposes of the residue of unrecovered waste materials at a landfill.

*The Defendants*

8. Defendant City of Akron is a charter municipality in Ohio. The City encompasses an area of 54 square miles. In 1976, its population approximated 269,000.

9. Defendant John Ballard is the Mayor of the City of Akron, Ohio.

10. Defendants Ray Kapper, Elsie Reavan, James R. Williams, Tim David, Vincent Ciraco, Robert L. Goehler, Reginald K. Brooks, Kathleen Greissing, Robert J. Otterman, Mickey Eritano, Jr., John V. Frank, Don Plusquellic and William C. Grimm, or their duly appointed or elected successors, are residents of the City of Akron and members of the Akron City Council, being duly elected in accordance with the City's Charter.

11. Defendant Robert Edwards is the Public Service Director for the City of Akron.

12. Defendant Summit County ("the County") is a county organized and existing under the constitution and laws of the State of Ohio, containing approximately 416 square miles, and having a population, as of 1976, of approximately 535,000 persons.

13. Defendants Mark Ravenscraft, Ted Cole and Don Stephens, or their duly elected or appointed successors to office, are residents of the County and comprise the Board of Summit County Commissioners, being duly elected in accordance with the laws of the State of Ohio.

14. Defendant Ohio Water Development Authority ("OWDA") is "a body corporate and politic of the State of Ohio," created by Chapter 6121 of the Ohio Revised Code.

*Nature of the Akron Area Waste Business*

15. The residents and businesses located in the City of Akron and in Summit County, Ohio, generated approximately 1300 tons of solid waste material daily in 1976. Single and two-family residential waste generated in the City of Akron is either collected by City trucks or by private trucks operated by

a firm under contract to the City and licensed by the City. Virtually all other residential solid waste, as well as solid waste generated by commercial or industrial establishments in the City (hereinafter sometimes referred to as "commercial waste"), is collected by private firms, licensed by the City, which contract directly with these customers.

16. Residential waste collected by City trucks or firms under City contract presently is disposed of at the Hardy Road Landfill operated by the City, which charges a fee for all waste it receives based upon volume. Private firms collecting residential waste, but not under City contract, or commercial waste in the City or County are presently, and always have been, free to take such material to whatever public or private disposal site they find most economical, whether inside or outside the City or County. Collectors are also presently, and always have been, free to separate, process, recycle or resell any such waste material they collect.

17. The public and private landfills, including plaintiffs, now operating in the Akron-Summit County area required to hold permits under State law and are inspected by County or Municipal Boards of Health and by the Ohio EPA. Private landfills in this area have competed among themselves and with public sites to attract waste material in the past and do so presently as well.

### The Recycle Energy System

18. During the period 1950 to 1970, the City operated a series of facilities within its corporate limits to dispose of solid waste generated in the City and neighboring communities; specifically:

| Facility | Inclusive Dates of Operation |
| --- | --- |
| Evans Avenue incineration plant | Closed 1954 |
| Landfill at Robinson Clay Products Clay Pit | 1952–1955 |
| Kelly Avenue Landfill | 1955–1963 |
| Cuyahoga Street (North of Tallmadge Parkway) | 1963–1968 |

| Facility | Inclusive Dates of Operation |
| --- | --- |
| Landfill and Peck Road Landfill | |
| Cuyahoga Street (Near the Workhouse) Landfill | 1969–1970 |

In addition to the City's facilities, the City of Barberton operated an incinerator and there were a number of disposal facilities located throughout the County.

19. In the late 1960's, officials in Akron and Summit County foresaw a need for new solid waste disposal facilities, principally triggered by two factors:

(1) The solid waste disposal regulations (effective July 1, 1968) adopted by the Public Health Council (now EPA) pursuant to the Ohio Waste Disposal Act (Chapter 3734, Ohio Revised Code) placed substantial constraints on future location and operation of waste disposal sites.

(2) The Cuyahoga Street Landfill, then the only sanitary landfill in the County, was fast filling up.

20. The need for new facilities was discussed at several meetings between the Mayors of Akron, Cuyahoga Falls and Barberton during the first quarter of 1968. Beginning in mid-1968, representatives of the County participated in these meetings.

21. The City's Department of Planning and Urban Renewal ("Planning Department") undertook, in early 1968, a Comprehensive Regional Waste Disposal Study ("the Study") to find a long-term solution to disposing of solid waste in the Akron area. The Planning Department considered a number of alternative means to effect a long-term solution, including sanitary landfill, transfer stations, incineration, composting, rail haul to strip mines, etc. Part 1 of this Study, dated August, 1968, was devoted to sanitary landfills. In preparing this study, City employees inventoried existing disposal facilities both within and outside of Summit County. They also studied 102 potential landfill sites within Summit County, but concluded that only 7 of these sites, all located in the southern part of the County, were feasible for landfill development based on the criteria of the study.

22. As part of its study, the City also helped finance and participated in a solid waste rail haul study sponsored by the American Public Works Association to research the technology and feasibility of hauling compacted solid waste to strip mines for disposal.

23. In May, 1968, representatives of the City took a field trip to New York and New Jersey to study the operation of solid waste incinerators in three communities. In late 1968, the Planning Department prepared a rough draft of Part 2 of its study devoted to incineration.

24. In February, 1969, the City appropriated $22,000 to hire Glaus, Pyle & Schomer to undertake a "Study Of The Methods And Feasibility Of Incineration For Waste Disposal" including "[a]nalysis of waste heat recovery possibilities and consideration of waste heat recovery to offset expenses." Glaus, Pyle concluded that the technology for constructing and operating a "Recycle Energy System" (RES) to convert solid waste to steam or electricity was available but economically unfeasible at the time. Consequently, the Glaus, Pyle study was shelved in September, 1969.

25. Meanwhile, the expected closing of the Cuyahoga Street Landfill created an immediate need to find a new disposal site. In meetings between officials of the County and City, alternative solutions were discussed. In early 1969, officials of the City and County agreed to cooperate in creating a new landfill to be operated by the City as a regional project. In March, the Commissioners created a Garbage and Refuse Disposal District consisting of all of the unincorporated territory in the County pursuant to Title 343 of the Ohio Revised Code to facilitate the establishment and operation of a new regional landfill site; and the City decided to establish a new sanitary landfill on a site it owned on Hardy Road in Northampton Township. In May, 1969, the Township Trustees filed suit against the City to enjoin a landfill operation on the Hardy Road site (*Leo Blower, et al. v. The City of Akron*, Summit County Case No. 276209), and the Court issued a preliminary injunction partially enjoining the acceptance of solid waste at the Hardy Road landfill site. This litigation was ultimately settled by agreement dated December, 1969, pursuant to which the City agreed to cease operating a landfill at the Hardy Road site at the expiration of five years, with a provisional right to operate for an additional three years if it had "operated the landfill strictly in accordance with applicable laws and regulations" during the first five year period. On April 21, 1970, the Board of Summit County Commissioners adopted Resolution 441–70, authorizing an agreement between the County and the City of Akron for the opening, operation and maintenance of the Hardy Road Landfill by the City of Akron as a waste disposal facility within Garbage and Refuse Disposal District No. 1.

26. The Hardy Road landfill opened for business in June, 1970. Total annual tonnage disposed of at the landfill from 1971 through 1978 is as follows:

| Year | Tons* |
|------|-------|
| 1971 | 79,000 |
| 1972 | 70,988 |
| 1973 | 101,958 |
| 1974 | 164,325 |
| 1975 | 239,900 |
| 1976 | 239,399 |
| 1977 | 272,273 |
| 1978 | 284,122 |

The landfill has generated complaints from some area residents, the County Board of Health and the Ohio EPA. In 1975, Northampton Township again filed suit to shut down the landfill (*Board of Trustees of Northampton Township v. City of Akron*, Summit Co. C.P. Case No. 7592121); and in 1977, the County Board of Health instituted a proceeding to revoke the City's license to operate the landfill. In 1978, the City succeeded in annexing the Hardy Road site

* The scales at Hardy Road periodically fail to operate. Consequently, actual tonnage delivered exceeds these figures.

688

and contiguous land, thereby relieving it of its contractual obligation to the Township to discontinue landfill operations on the site that year.

27. In 1970 and 1971, the Planning Department continued its study, investigating a number of new technologies to dispose of solid waste, including pyrolosis, the generation of gas from solid waste. Among other things, City officials visited RES projects in Montreal, St. Louis, Chicago and Rochester.

28. In February, 1971, Ohio Edison petitioned the Public Utilities Commission to abandon its steam heating system in Akron because it was unprofitable to Ohio Edison and because the Company was faced with substantial new capital requirements to meet tightened state air emission standards. The PUCO ultimately denied this petition. That same month, Council authorized the Planning Department and Glaus, Pyle to undertake an RES preliminary feasibility study.

29. In July, 1971, the Planning Department issued its "Comprehensive Regional Waste Disposal Study." The report summarized existing solid waste disposal facilities in the County and concluded that they would be filled by 1978. The report then examined alternative methods for providing a long-term solid waste disposal solution including:

(1) sanitary landfill;
(2) incineration;
(3) composting of solid waste;
(4) rail haul;
(5) size and volume reduction methods (shredding and crushing); and
(6) resource recovery techniques.

In August, 1971, Glaus, Pyle issued its RES report entitled, "Feasibility Study of Solid Waste Reduction and Energy Recovery."

30. In the year following issuance of the Planning Department and Glaus, Pyle reports, the City's administration took the proposed RES project under advisement. In September, 1972, after a visit to the RES steam plant in Hamilton, Ontario, Mayor Ballard indicated support for the RES project. On October 2, Council held a public hearing on the project; on October 17, the City's Health Commission approved and supported the project. In November, Council passed a resolution inviting proposals from engineering firms interested in designing the project. In April, 1973, after considering a number of alternative technologies, Council authorized the administration to retain Glaus, Pyle to design an RES project at a cost not to exceed $710,000.

31. In May, 1974, the City's Planning Department issued a report entitled "Solid Waste Disposal in the Akron Area." In June, 1974, Glaus, Pyle issued its Preliminary Phase Report on the RES plant. In December, 1974, final plans and specifications for the RES project were completed. In December, 1974, construction contracts were let out for bid; and in February, 1975, the City received bids on all construction contracts for the project.

32. Commencing in March, 1975, the City, its bond counsel and its financial consultant began formulating concrete plans to finance the project by the issuance of revenue bonds. It was recognized that one element of the project's feasibility was its ability to obtain sufficient solid waste of adequate BTU content over the term of the bonds. To provide an assurance of supply, Council authorized the Director of Public Service to contract with "other units of local government and/or private firms for the deposit of trash and garbage for disposal at the recycle energy system."

33. In mid-1975, the underwriters advised the City that its proposed RES revenue bonds would not be marketable. Consequently, the City asked the Ohio Water Development Authority ("OWDA") to finance the project. OWDA agreed to finance the project at its September 11, 1975 meeting. Construction contracts were immediately awarded to the low bidders subject to obtaining financing for the project. However, in early November, 1975, counsel for OWDA opined that the City could not secure the OWDA's bonds from its general fund, and, therefore, the proposed financing had to be restructured. In the succeeding months, the underwriters unsuccessfully at-

tempted to restructure the financing. In the course of time, the City began looking for new underwriters. In July, 1976, Dillon, Reed & Co. agreed to head a new underwriting team to purchase and resell the OWDA's RES bonds.

34. The new underwriting team substantially restructured the proposed financing in an effort to make the OWDA's bonds for the RES project marketable. Among other things, the underwriters:

(1) renegotiated the steam contracts with B. F. Goodrich, Akron University and Akron City Hospital to provide stronger long-term guarantees; and

(2) required the creation of a separate $10,000,000 Project Contingency Fund to cover construction cost overruns.

The steam contracts were successfully renegotiated and the City created the $10,000,000 Project Contingency Fund by committing $5,000,000 of its own general obligation money and obtaining the County Commissioner's agreement to commit $5,000,000 of the County's general obligation money to the contingency fund.

35. The Project, to be located in, operated and owned by, the City of Akron, entered construction in December, 1976, and is scheduled to commence operation in September, 1979. It essentially consists of a solid waste shredding facility, classification and separation facilities, three industrial spreader-stokers and boilers capable of employing shredded solid waste as fuel to create steam, and existing and proposed steam distribution lines and systems located in the City of Akron, Ohio. The Project is to provide steam to many of the some 200 businesses and other energy customers presently buying steam from Ohio Edison and to other energy customers as well. Already signed to long-term contracts with the Project are approximately thirty area businesses, including B. F. Goodrich Company, and other energy customers. The Project will remove from waste it receives ferrous scrap and will seek to sell such scrap in existing markets for such material. The Project will also, if and when economically feasible, extract other metals and non-metallic waste components for sale. Defendant City has projected that revenues of the RES from the sale of ferrous material for the first year of operation of the RES will be approximately $681,000 and will increase in subsequent years.

36. On November 10, 1976, the City entered into a contract with Teledyne National, a division of Teledyne Industries, Inc. ("Teledyne"), a California corporation, to supervise construction of the Project and then to operate it for a five-year term, renewable at one-year intervals thereafter if both parties agree. Teledyne's contract includes a basic $360,000 fee, plus certain incentives, for construction supervision and a cost reimbursement plus $150,000 fixed fee arrangement for operation. In addition, Teledyne will receive half of all gross revenues of the Project attributable to sale of recovered ferrous and other materials in excess of certain minimum revenues and related expenses. The approximate volume of solid waste presently being brought to the Hardy Road Landfill from all sources is 1300 tons per day. The Project is designed to process up to a maximum of 2240 tons of solid waste per day. It is Teledyne's present intention to operate at the level of approximately 1400 tons per day.

37. An incentive to Teledyne in entering the contract to operate the RES was its agreed share of revenues from ferrous or other recoverable sales. Based on guidelines to be issued by the City, Teledyne will designate waste materials that are acceptable to the Project.

*The Cooperative Agreement*

38. On October 4, 1976, Council authorized the City to enter into a Cooperative Agreement with OWDA and the County to finance the RES facility. On October 14, the Board of County Commissioners authorized the County to execute the Cooperative Agreement by Resolution 1381–76. Section 5.5 of this agreement provides that the City ("LGA") covenants with the OWDA for the benefit of the bond holders that:

"H. The LGA will not establish, construct or operate nor consent to the es-

tablishment, construction or operation of any facility for the disposal or other treatment of Solid Waste which is acceptable for disposal by the Project and for which the Project has capacity available and which the OWDA determines to be detrimental to the Project, and, further, to the extent legally permissible, it will oppose the establishment, construction or operation of such a facility. The LGA System shall not charge to or collect from the Project any charge for the haulage or disposal of (i) any Solid Waste residue remaining after processing by the Project and (ii) any Solid Waste which is delivered to the Project and which is not suitable for incineration by the Project or resource recovery, and the LGA shall be responsible for the disposal of such Solid Waste.

I. For the term of this Agreement, the LGA shall require that all collectors and haulers of Solid Waste within the LGA be licensed by the LGA and all such licenses shall provide that all collectors or haulers of Solid Waste shall dispose of all Solid Waste generated within the corporate limits of the LGA which is acceptable for disposal by the Project to be delivered to the Project for disposal through the Project and require that such haulers and collectors and the LGA pay or cause to be paid the fees and charges imposed by the LGA for the disposal of Solid Wastes at the Project. The LGA will take all available action, administrative, judicial and legislative, to cause all Solid Waste generated within the corporate limits of the LGA and which is acceptable for disposal by the Project, to be delivered to the Project for disposal through the Project.

&ast; &ast; &ast; &ast; &ast; &ast;

"O. . . . The LGA shall use its best efforts to establish rates and charges for the disposal of Solid Waste through the Project at a level which assures an adequate supply of Solid Waste for the purpose of the Project and, subject to the foregoing, shall be comparable with competitive charges for such services. . . ."

Under Section 5.6 of the Cooperative Agreement, the County covenants with OWDA for the benefit of the bond holders that:

"A. The County will not establish, construct, or operate nor consent to the establishment, construction or operation of any facility for the disposal or other treatment which OWDA solely determines to be detrimental to the Project of Solid Waste which is acceptable for disposal by the Project and for which the Project has capacity available, and further to the extent legally permissible, it will oppose the establishment, construction or operation of such facilities.

"B. The County will take all legally available action, administrative, judicial and legislative, to cause all Solid Waste generated within the County and which is acceptable for disposal by the Project and for which the Project has capacity available, to be delivered to the Project for disposal through the Project."

39. Contained in section 6.10 of the Cooperative Agreement are the following warranties and representations made by the County in entering into the Cooperative Agreement:

(a) The County is a county duly organized and existing under the laws of the State, is not in violation of any provision of the Constitution or laws of the State relevant to the transactions contemplated by this Agreement or the Indenture.

(b) The County has full power and authority to execute and deliver this Agreement and to carry out the transactions contemplated thereby. This Agreement and such contracts have by proper action been duly authorized, executed and delivered by the County and all steps necessary have been taken to constitute this Agreement a valid and binding obligation of the County.

(c) The execution, delivery and performance by the County of this Agreement and the consummation of the transactions contemplated hereby will not vi-

olate any provision of the constitution, law, resolution or regulation applicable to the County, or of any writ or decree of any court or governmental instrumentality, or of any indenture, contract, agreement or other undertaking to which the County is a party or which purports to be binding upon the County or upon any of its assets.

40. Counsel for the County states that the County has taken no action to implement its covenants under Section 5.6 of the Cooperative Agreement. None of the other parties to this suit is aware of any such action by the County.

41. The Cooperative Agreement was signed by the City, the County and OWDA effective December 1, 1976.

42. On December 6, 1976, OWDA issued an Official Statement noticing the offering of $46,000,000 of special obligation bonds to finance the acquisition, construction and equipping of the Project. Contained in the Official Statement is a restatement of the Cooperative Agreement.

### The Ordinance

43. On October 4, 1976, prior to but in contemplation of and for the purpose of giving effect to the covenants undertaken by the three governmental entities in the Cooperative Agreement, the Council of the City of Akron, Ohio, passed Ordinance No. 841–76 (hereinafter "Ordinance"). This Ordinance, which amends Section 850.06, 1068.06 and 1068.14 of the Codified Ordinances of the City of Akron (hereinafter "Codified Ordinances"), revised licensing requirements and service charges with respect to the collection and disposal of garbage and rubbish within the City of Akron. Specifically, Section 1(a) of the Ordinance amends Section 850.06 of the Codified Ordinance as follows:

"(a) Until such time as the City's recycle energy plant begins accepting rubbish for disposal, no rubbish shall be deposited by the holder of a rubbish hauler's license within the corporate limits of the City except at a place designated in writing by the Mayor. From and after the date on which such plant begins accepting rubbish for disposal, all rubbish collected within the corporate limits of the City by a holder of a rubbish hauler's license shall be deposited at such plant; provided that rubbish which is not acceptable for disposal by such plant shall not be deposited within the City except at a place designated in writing by the Mayor."

Section 2 of the Ordinance amends Section 1068.06 of the Codified Ordinance as follows:

"No person, except duly authorized collectors of the City or private haulers licensed pursuant to law, shall collect or remove any garbage or rubbish accumulating within the City or use the streets, avenues and alleys of the City for the purpose of collecting or transporting the same. All licenses granted to such private haulers and all contracts or other forms of authorization of duly authorized collectors shall require that all garbage or rubbish collected and transported under authority for disposal by the City's energy plant, be disposed of at such plant from and after the date on which such plant begins accepting garbage and rubbish for disposal."

Section 3 of the Ordinance establishes a collection and disposal fee for garbage and rubbish generated within the City's limits during the calendar year 1978. Section 3 also provides that:

"[t]he Director of Public Service is authorized to promulgate rules and regulations for the collection of said service charge and he is further authorized with consent of Council to adjust such charge upward on January 1, 1979 or on January 1 of any year thereafter."

44. The prefatory language contained in the Ordinance states:

"Whereas, in connection with the financing of the City's recycle energy facility, it is necessary to provide for revised service charges for the collection and disposal of garbage and rubbish and to revise licensing provisions to require that

garbage and rubbish collected by private haulers be disposed of at the new facility when completed."

### Effect of the Ordinance

45. Collectors and transporters of solid waste in the City presently holding licenses issued by defendant City, including plaintiffs Hawley, Kovach and Hybud, and persons who may in the future apply for and obtain such licenses, shall be required, as a condition of such licenses, after the RES commences operation, to bring to RES all solid waste collected in the City and which the City determines to be acceptable for RES, and to pay RES such fees for disposal there as the City shall establish from time to time. Persons holding such licenses who fail or refuse to comply with said requirements shall be subject to potential loss of such licenses, in which case they will be prohibited from collecting or transporting solid waste in the City of Akron, or they may be subject to criminal prosecution by the City. Parties who collect solid waste within the City without licenses as prescribed by the Ordinance will be subject to criminal prosecution.

46. Solid waste "acceptable for disposal" by the RES, as prescribed in the Ordinance, shall include all solid waste generated in the City other than hazardous wastes or certain items the RES is not equipped to handle. Such rejected items will not include paper, cardboard or most other combustibles or most materials containing ferrous or other recoverable metals.

47. The Ordinance will prevent plaintiffs Hawley, Kovach and Hybud, or any other persons holding City licenses, from taking solid wastes subject to the Ordinance (i. e., solid waste collected within Akron which is acceptable for disposal at RES) to private or public disposal facilities outside of the City after RES commences operation, including plaintiffs Glenwillow and Portage.

48. To the extent plaintiffs Hawley, Kovach or Hybud, or any other collectors presently, or in the future, holding licenses from the City, may, due to economic or other competitive or business factors, seek to engage in the separation of paper, cardboard, metals or other materials from the solid waste they collect that is subject to the Ordinance, for the purpose of selling such recovered materials for profit, the effect of the Ordinance will be to prevent said collectors from doing so.

49. To the extent public or private entities located in Ohio or outside Ohio may wish to purchase materials recovered from solid waste subject to the Ordinance, and to the extent they would otherwise be able to do so but for the Ordinance, the effect of the Ordinance will be to prevent them from doing so, other than directly or indirectly from the RES.

50. To the extent plaintiff Budoff or any other firms in Ohio may purchase or otherwise receive solid waste subject to the Ordinance, and to the extent they would otherwise be able to do so but for the Ordinance, the effect of the Ordinance will be to prevent them from receiving such solid waste.

90. The City, County and OWDA participated in the issuance of $46,000,000 in revenue bonds.

91. The bonds described in ¶ 90 were purchased by persons inside and outside Ohio.

92. Defendant City will offer for sale to customers inside and outside of Ohio ferrous material recovered by RES from Akron solid waste.

### APPENDIX B

Appendix B shall remain under seal as it contains confidential information that is subject to a protective order entered by the Court.

### APPENDIX C

B. *Emergence of The Akron-Summit County Solid Waste Disposal Problem and Genesis of RES*

4. Single and two-family residential waste generated in the City of Akron is either collected by City trucks or by private

trucks operated by a firm under contract to the City which is licensed to collect and haul solid waste in the City. Virtually all other solid waste generated in the City, including commercial and industrial solid waste is collected by private firms licensed by the City to collect and haul solid waste within its corporate limits. During the period 1950 to 1970, the City operated a series of facilities within its corporate limits to dispose of solid waste generated in the City and neighboring communities; specifically:

| Facility | Inclusive Dates of Operation |
| --- | --- |
| Evans Avenue incineration plant | Closed 1954 |
| Landfill at Robinson Clay Products | 1952–1955 |
| Kelly Avenue Landfill | 1955–1963 |
| Cuyahoga Street (north of Tallmadge Parkway) Landfill and Peck Road Landfill | 1963–1968 |
| Cuyahoga Street (near the Workhouse) Landfill | 1969–1970 |

In addition to the City's facilities, the City of Barberton operated an incinerator and there were a number of open dumps located throughout the County.

5. In the late 1960's, it became apparent that the Akron-Summit County area would soon be facing a serious waste disposal problem, principally triggered by two factors:

(1) The solid waste disposal regulations (effective July 1, 1968) adopted by the Public Health Council (now EPA) pursuant to the Ohio Waste Disposal Act (Chapter 3734, Ohio Revised Code) outlawed the open dumps being operated in the County and placed substantial constraints on future location and operation of waste disposal sites.

(2) The Cuyahoga Street landfill, then the only sanitary landfill in the County, was fast filling up, a condition exacerbated by the increasing quantities of solid waste attracted to the landfill by dump closings.

6. The impending solid waste problem was recognized by responsible officials as a regional problem, and was discussed at several meetings between the Mayors of Akron, Cuyahoga Falls and Barberton during the first quarter of 1968. At the time, Barberton was disposing of its solid waste at two open dumps which could not comply with the new solid waste disposal regulation. Cuyahoga Falls was disposing of most of its solid waste at the Portage Landfill (operated by plaintiff Waldo A. Sober, Jr.); but the City was concerned about the continued ability of that landfill to operate under the new solid waste. regulations, as well as the high hauling and disposal costs it was incurring using that landfill. Beginning in mid-1968, representatives of the County participated in these meetings.

7. In response to the solid waste problem, the City's Department of Planning and Urban Renewal ("Planning Department") undertook, in early 1968, a comprehensive study to find a long-term solution to the problem. The Planning Department considered a number of alternative means to effect a long-term solution to the problem including sanitary landfill, transfer stations, incineration, composting, rail haul to strip mines, etc. Part 1 of this study, dated August, 1968, was devoted to sanitary landfills. In preparing this study, City employees inventoried existing disposal facilities both within and outside of Summit County which they determined to be inadequate. They also studied 102 potential landfill sites within Summit County, but determined that only 7 of these sites, all located in the southern part of the County, were feasible for landfill development from a physical-topographical standpoint.

8. As part of its comprehensive study, the City also helped finance and participated in a solid waste rail haul study sponsored by the American Public Works Association undertaken to research the technology and feasibility of hauling compacted solid waste to strip mines for disposal.

9. In May, 1968, representatives of the City took a field trip to New York and New Jersey to study the operation of solid waste incinerators in three communities. In late 1968, the Planning Department prepared a

rough draft of Part 2 of its comprehensive study devoted to incineration. This draft generally concluded, among other things, that:

"Despite the higher costs, disposal of solid wastes by incineration is inherently prompt, thorough and complete. Modern incinerator facilities are very efficient and are architecturally or aesthetically pleasing. There is little or no separating of solid waste required. A properly designed and operated incinerator can be constructed in a heavily built-up area without creating a nuisance. There should be no problem in meeting the State Health Department requirements. "It is possible to generate steam or electricity from the waste heat which may help to offset the relatively high operating costs." [p4]

The City's planners believed incineration was a superior long-range solution to landfilling for a number of reasons, including the facts that:

(1) An incinerator can be centrally located within the corporate limits, thereby obviating costly hauling and assuring that the City retains control over the facility.

(2) The ash can be used for fill or safely landfilled requiring the utilization of far less land.

(3) Incineration markedly reduces the pollution and nuisances associated with landfills and, to the extent it replaces coal fired boilers, actually reduces air pollution.

(4) The costs of operation can be offset by the sale of steam or electricity and recyclable materials.

10. By February, 1969, the City was sufficiently enthused by the incineration alternative to appropriate $22,000 to hire Glaus, Pyle & Schomer, an A & E firm with considerable experience in boiler design, to undertake a "Study Of The Methods And Feasibility Of Incineration For Waste Disposal" including "[a]nalysis of waste heat recovery possibilities and consideration of waste heat recovery to offset expenses." Glaus, Pyle concluded that the technology for constructing and operating a "Recycle Energy System" (RES) to convert solid waste to steam or electricity was available. However, after investigating a number of different markets for steam or electricity which would be produced by an RES, Glaus, Pyle concluded that there was no available market. One such potential market, the steam users in Akron's Central Business District (CBD) whose needs were being satisfied by Ohio Edison, were not enthusiastic about buying steam from the City. Furthermore, the sharp seasonal variations in the CBD's steam load made an RES project to serve the CBD uneconomic unless B. F. Goodrich, which is located close to the CBD and uses substantial quantities of steam year-round for manufacturing purposes, could be persuaded to enter into a long-term contract to purchase the project's excess steam on an interruptible basis. At that time, B. F. Goodrich was not interested in the project as a long-term source of steam. Consequently, the Glaus, Pyle study was shelved in September, 1969.

11. Meanwhile, an acute solid waste disposal problem created by the increasing quantities of solid waste being delivered to the Cuyahoga Street landfill forced the City's planners to concentrate on finding a stop-gap solution. In October, 1968, Martha D. Nelson, M.D., Health Commissioner of the Summit County General Health District, wrote the County Commissioners warning that the paucity of landfill sites in Summit County posed a serious problem. "This is a most urgent matter as it is entirely possible that on July 1, 1969 the Summit County area would be without any solid waste disposal facility." In subsequent meetings between officials of the County and City, a number of alternatives were discussed. In early 1969, officials of the City and County agreed to cooperate in creating a new landfill to be operated by the City as a regional project; and in March, the Commissioners created a Garbage and Refuse Disposal District pursuant to Title 343 of the Ohio Revised Code to facilitate the establishment and operation of a new regional landfill site.

C. *The Hardy Road Landfill—A Short-Term Solution To The Problem*

12. Faced with imminent closing of the Cuyahoga Street landfill, the City reluctantly decided to develop a new sanitary landfill on a 100 acre tract of woodland it owned outside of the City on Hardy Road in Northampton Township. The City's decision drew immediate, adverse response from residents in Northampton Township. In May, 1969, the Township Trustees filed suit against the City to enjoin a landfill operation on the Hardy Road site (*Leo Blower, et al. v. The City of Akron*, Summit County Case No. 276209), and the Court issued a preliminary injunction partially enjoining the acceptance of solid waste at the Hardy Road landfill site. This litigation was ultimately settled by agreement dated December, 1969, pursuant to which the City agreed to cease operating a landfill at the Hardy Road site at the expiration of five years, with a provisional right to operate for an additional three years if it had "operated the landfill strictly in accordance with applicable laws and regulations" during the first five year period.

13. The Hardy Road landfill opened for business in June, 1970. Total annual tonnage disposed of at the landfill from 1971 through 1978 is as follows:

| Year | Tons* |
|------|-------|
| 1971 | 79,000 |
| 1972 | 70,988 |
| 1973 | 101,958 |
| 1974 | 164,325 |
| 1975 | 239,900 |
| 1976 | 239,399 |
| 1977 | 272,273 |
| 1978 | 284,122 |

Since 1975, the Hardy Road landfill has been the only public solid waste disposal facility operating in the Akron area capable of disposing of solid waste. Public and private haulers of the solid waste generated within Akron, Barberton, Cuyahoga Falls and other communities in the Akron area dispose of most of the solid waste they collect in these communities at the City's Hardy Road landfill. Operation of the landfill has generated continuing complaints from its neighbors, the County Board of Health and the Ohio EPA. In 1975, Northampton Township again filed suit to shut down the landfill (*Board of Trustees of Northampton Township v. City of Akron*, Summit Co. C.P. Case No. 7592121); and in 1977, the County Board of Health instituted a proceeding to revoke the City's license to operate the landfill. In 1978, the City succeeded in annexing the Hardy Road site and contiguous land, thereby relieving it of its contractual obligation to the Township to discontinue landfill operations on the site that year. But the operation of the landfill continues to generate protests [from] its neighbors, the County Board of Health and the Ohio EPA.

---

* The scales at Hardy Road periodically fail to operate. Consequently, actual tonnage delivered exceeds these figures.