**HYBUD EQUIPMENT CORP., et al.,
Plaintiffs-Appellants,**

v.

**CITY OF AKRON, OHIO, et al.,
Defendants-Appellees.**

No. 83–3306.

United States Court of Appeals,
Sixth Circuit.

Argued April 16, 1984.

Decided Aug. 24, 1984.

Merritt, Circuit Judge, filed concurring opinion.

---

34. *Accord, United States v. Alonzo,* 571 F.2d 1384, 1387 (5th Cir.1978), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978).

William C. Brashares, argued, John H. Korns, (LC), Charles A. Samuels, Cladouhos & Brashares, Washington, D.C., Joseph Abdenour, Akron, Ohio, Francis X. Beytagh, Toledo, Ohio, John L. Wolfe, Akron, Ohio, for plaintiffs-appellants.

Edward J. Riegler (LC), W.F. Spicer, James L. Bickett, Akron, Ohio, Eben Crawford, argued, Cleveland, Ohio, John E. Holcomb, Akron, Ohio, William E. Schultz, Steven J. Schwartz, Timothy M. Hartman, Asst. Pros. Attys., Akron, Ohio, William Baughman, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, for defendants-appellees.

John W. Pestle, Randall W. Kraker, Jeffrey S. Rueble, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for amicus curiae Public Corp. Law Section of the State Bar of Mich., The Mich. Tps. Assoc. and Mich. Cities of Ann Arbor, Battle Creek, Dearborn, Detroit, Flint, Grand Haven, Grand Rapids, Holland, Kalamazoo, Lansing, Livonia, Pontiac, Southfield, Traverse City and Troy.

Before MERRITT and MARTIN, Circuit Judges; BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This case, which now makes its third appearance before this court, is one of the increasingly frequent challenges under the federal antitrust laws to the actions of state and municipal bodies. These actions raise fundamental questions about the balance of federal and state power and pose the inherent conflict between the national policy of free competition and the anticompetitive consequences of state regulation. This rapidly evolving area of the law portends far-reaching changes in the role of the federal courts in reviewing the exercise of regulatory authority by the states and, ultimately, in the relationship between states and their political subdivisions.[1]

---

1. The implications of recent Supreme Court decisions in this area have provoked much scholarly discussion. *See e.g., Posner, The Proper Relationship between State Regulation and the Federal Antitrust Laws*, 49 N.Y.U.L.Rev. 693 (1974); Slater, *Antitrust and Government Ac-*

The plaintiffs in the instant case allege that the City of Akron, as part of a comprehensive program to dispose of solid waste and create steam energy, has monopolized the business of solid waste processing in violation of the Sherman Antitrust Act. 15 U.S.C. § 1 *et seq.* The defendants, including the City and a state agency, contend that their actions are protected by the "state action exemption" to the antitrust law developed by *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny. The plaintiffs appeal from summary judgment holding that the defendants' actions were within the state action exemption and therefore immune to antitrust attack.

## I.

### A. History of the Recycle Energy System and the Ordinance Under Challenge.

The facts in this case are set forth in detail in the original district court opinion, *Glenwillow Landfill, Inc. v. City of Akron,* 485 F.Supp. 671 (N.D.Ohio 1979). Those facts relevant to the issues before us are summarized below.

The plaintiffs in this case challenge an ordinance adopted as part of a plan to solve two pressing problems confronting the City of Akron. In the late 1960's, Akron had exhausted all but one sanitary landfill for solid waste disposal. A proposal to open a new site encountered immediate legal challenges. As the City struggled to find alternatives for waste disposal, Ohio Edison petitioned the Public Utilities Commission to permit the company to abandon its steam heating system and halt the supply of steam for Akron's downtown business district.

In an effort to find a single solution to its difficulties, the City began to consider constructing a "Recycle Energy System" ("RES") to convert solid waste into steam. After several studies and a public hearing, the City Council, in April 1973, authorized the City administration to retain a firm to design an RES project. By December 1974, final plans and specifications were completed and construction contracts were let out for bid. Financing, however, proved to be a substantial barrier. The City intended to issue revenue bonds to finance the project, but in mid-1975 the underwriters for the bond issue informed the City that the bonds would not be marketable.

The City turned to the Ohio Water Development Agency ("OWDA") for assistance, and in September 1975, OWDA agreed to finance the project by issuing revenue bonds. When OWDA found that the bond issue could not be secured by the City's general fund, the proposed financing package was restructured with new underwriters. The new underwriters renegotiated steam supply contracts for the project and required the creation of a special contingency fund by the City and county governments to cover construction cost overruns. The underwriters also determined that the RES must be assured a steady supply of waste in order to market the bonds. Following this evaluation, the City and OWDA decided that it would be necessary to require, by ordinance, that all solid waste collected within the City limits be transported to the RES facility.

In 1976, the City and OWDA entered into a Cooperative Agreement to finance the RES project. Section 5.5 of the Agreement provides that the City ("LGA") covenants with the OWDA for the benefit of the bond holders that:

I. For the term of this Agreement, the LGA shall require that all collectors and

tion: A Formula for Narrowing Parker v. Brown, 69 Nw.U.L.Rev. 71 (1974); Rogers, *Municipal Antitrust Liability in a Federalist System,* 1980 Ariz.St.L.J. 305; Areeda, *Antitrust Immunity for State Action After Lafayette,* 95 Harv.L.Rev. 435 (1981); Civiletti, *The Fallout from Communications Co. v. City of Boulder,* 32 Cath.U.L.Rev. 379 (1983). These decisions have also given rise to much litigation presenting serious and unsettled questions. *See e.g., Town of Hallie v. City of Eau Claire,* 700 F.2d 376 (7th Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984); *Central Iowa Refuse System v. Des Moines Metropolitan Solid Waste Agency,* 715 F.2d 419 (8th Cir.1983), *petition for cert. filed,* 52 U.S.L.W. 3441 (U.S. Nov. 18, 1983) (No. 83–825).

haulers of Solid Waste within the LGA be licensed by the LGA and all such licenses shall provide that all collectors or haulers of Solid Waste shall dispose of all Solid Waste generated within the corporate limits of the LGA which is acceptable for disposal by the Project to be delivered to the Project for disposal through the Project and require that such haulers and collectors and the LGA pay or cause to be paid the fees and charges imposed by the LGA for the disposal of Solid Wastes at the Project. The LGA will take all available action, administrative, judicial and legislative, to cause all Solid Waste generated within the corporate limits of the LGA and which is acceptable for disposal by the Project, to be delivered to the Project for disposal through the Project.

The Agreement further provides that the City would prohibit the establishment of alternative waste disposal sites.[2] In December 1976, the OWDA issued an Official Statement announcing the offering of $46,-000,000 of special obligation bonds to finance the project. The Statement contained a copy of the Cooperative Agreement.

To carry out the terms of the Agreement, the Akron City Council adopted Ordinance No. 841–76 in October, 1976. The ordinance requires all rubbish collected within the corporate limits of the City to be deposited at the RES plant. The ordinance also authorizes the Director of Public Service to establish a service charge ("tipping fee") for disposal of solid waste at the RES facility. Persons who violate the ordinance may lose their licenses and face criminal prosecution.[3]

Before the adoption of the ordinance, plaintiff Hybud Equipment Corp. was a licensed hauler of waste in the Akron area. Under agreements with various commercial and industrial firms, Hybud collected solid waste in return for a fee. An affiliated company, plaintiff Budoff Iron and Metal Corp., operated a transfer station that separated out recyclables—primarily cardboard and metals—to be sold. Nonrecyclable solid waste was transported to landfills where a tipping fee was charged to the haulers for each ton of waste disposed.

The ordinance affects the plaintiffs' business in several ways. All waste collected within the City limits must be transported to the RES plant and haulers must pay a uniform tipping fee to the RES plant. This exclusive right eliminates any possible competition among disposal sites within the

2. Two other sections of the Agreement provide:
H. The LGA will not establish, construct or operate nor consent to the establishment, construction or operation of any facility for the disposal or other treatment of Solid Waste which is acceptable for disposal by the Project, and further, to the extent legally permissible, it will oppose the establishment, construction or operation of such a facility. The LGA System shall not charge to or collect from the Project....
O. ... The LGA shall use its best efforts to establish rates and charges for the disposal of Solid Waste through the Project at a level which assures an adequate supply of Solid Waste for the purpose of the Project and, subject to the foregoing, shall be comparable with competitive charges for such services....

3. Section 1(a) of the ordinance provides:
Until such time as the City's recycle energy plant begins accepting rubbish for disposal, no rubbish shall be deposited by the Holder of a rubbish bailer's license within the corporate limits of the City except at a place designated in writing by the Mayor. From and after the date on which such plant begins accepting rubbish for disposal, all rubbish collected within the corporate limits of the City by a holder of a rubbish hauler's license shall be deposited at such plant; provided that rubbish which is not acceptable for disposal by such plant shall not be deposited within the City except at a place designated by the Mayor.
Section 2 provides:
No person, except duly authorized collectors of the City or private haulers licensed pursuant to law, shall collect or remove any garbage or rubbish accumulating within the City or use the streets, avenues and alleys of the City for the purpose of collecting or transporting the same. All licenses granted to such private haulers and all contracts or other forms of authorization of duly authorized collectors shall require that all garbage or rubbish collected and transported under authority for disposal by the City's energy plant, be disposed of at such plant from and after the date on which such plant begins accepting garbage and rubbish for disposal.

City and prohibits haulers from seeking lower tipping fees at sites outside the City. Furthermore, the separation and sale of recyclable materials by collectors is curtailed by the ordinance. All solid waste—including waste containing recyclables—must be delivered to the RES facility. Recyclable materials may be burned as fuel or separated by the plant operator and sold to generate additional income. As part of an incentive agreement, the operator of the plant, Teledyne National, is permitted to retain one-half of all revenues recovered from the sale of recyclable materials. The remainder is to be used to offset operating expenses.

## B. Prior Proceedings

The plaintiffs brought suit in federal court alleging that the ordinance and agreement deprived them of due process, constituted a restraint of commerce, and violated the Sherman Antitrust Act. In *Glenwillow Landfill, Inc. v. City of Akron*, 485 F.Supp. 671 (N.D.Ohio 1979), the district court awarded summary judgment to the defendants on all issues.

The district court ruled that the defendants' activities were protected from antitrust liability under the state action exemption of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The district court rested its decision on two alternative grounds. First, the court found that OWDA was acting for the state in advancing legitimate state interests. The restrictions in the Cooperative Agreement, the court found, were within OWDA's authority to finance solid waste facilities. This exercise of this state power, the court held, was beyond the reach of the antitrust laws. 485 F.Supp. at 676–77. Second, the court found that the state of Ohio had authorized the City of Akron through its home-rule powers to regulate waste collection. "[T]he Ohio Constitution declares that cities act as agents of the state when they exercise governmental powers within their city limits." 485 F.Supp. at 677. The Ohio courts, moreover, had held that such power could lawfully be exerted through a monopoly. Therefore, the district court concluded, the state action exemption protected the City's exercise of state power.

The district court's decision was affirmed on appeal. *Hybud Equipment Corp. v. City of Akron*, 654 F.2d 1187 (6th Cir. 1981). The collection of garbage and the operation of incineration plants, this court noted, were within the traditional activities of local governments. The home-rule provisions of the Ohio Constitution as interpreted by the State Supreme Court authorized municipal monopolies to carry out these functions. Moreover, an agency of the state, the OWDA, would oversee the exercise of this authority. Thus, this court held that the ordinance and agreement were immune from antitrust liability as actions of the state.

The Supreme Court granted the plaintiffs' petition for writ of certiorari and vacated this court's judgment. The case was remanded for consideration in light of the Court's decision in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). *Hybud Equipment Corp. v. City of Akron*, 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982). This court, in turn, remanded the case to the district court with instructions to reconsider only the plaintiffs' claims under the Sherman Antitrust Act. 701 F.2d 178.

On remand, the district court again held that the defendants' activities were protected by the state action exemption. Eschewing this court's reliance on Akron's home-rule powers, the district court found "sufficient grounds for antitrust exemption within the Ohio statutes governing the OWDA." The court found that these statutes demonstrated that the state legislature contemplated the anticompetitive consequences of OWDA's exercise of its bonding authority. This expression of state policy coupled with OWDA's supervision of the RES project, the district court held, shielded the City from liability under the federal antitrust laws and satisfied the requirements of *City of Boulder*. This determination is the sole issue now before us.

## II.

### A. The Development of the State Action Exemption.

The Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the original declaration of the state action exemption, continues to exert a strong influence on the recent development of that doctrine.[4] In *Parker*, the Court considered whether a state program restricting agricultural production could be attacked under the Sherman Act. Under California's Agricultural Prorate Act, the State Agricultural Prorate Advisory Commission authorized the creation of local cooperatives to establish marketing policies for raisin production. The Commission, appointed by the Governor pursuant to the statute, had to approve the cooperative's plans. To become effective, these plans then had to be ratified by a specified number of the producers in each area.

In *Parker*, the Court held that "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." 317 U.S. at 350–51, 63 S.Ct. at 313. Absent a clear indication from Congress, the States are entitled to immunity as an aspect of the federal system. "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 351, 63 S.Ct. at 313. The Court held that the prorate program was protected by this immunity. "It is the state which has created the machinery for establishing the prorate program." The participation of private producers and the referendum system did not detract from the character of the program. "The state itself exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required vote on the referendum is one of these conditions." *Id.* at 352, 63 S.Ct. at 314.

The decisions following *Parker* have been primarily concerned with determining the nature and extent of state involvement necessary to establish the exemption. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court considered a challenge to minimum fee schedules established by a county bar association and enforced by the state bar. Although the state bar was a "state agency" for purposes of investigating and reporting violations of disciplinary rules, the final statutory authority for regulating the practice of law was vested in the state supreme court. The state supreme court, however, had not directed the establishment of such schedules. The Court rejected the argument that the schedules were protected because they "complemented the objectives of the ethical codes." To claim the protection of the exemption, "[i]t is not enough that ... anticompetitive conduct is 'prompted' by state action; rather the anticompetitive activities must be compelled by direction of the State acting as sovereign." 421 U.S. at 791, 95 S.Ct. at 2015. Because the state, acting through the legislature or through the state supreme court, had not directed or authorized the anticompetitive action, the Court held that the schedules were not exempt from the Sherman Act as state action.

The implication of *Goldfarb* is that a rule adopted by a sovereign authority of the state would be entitled to antitrust immunity. The Court followed this reasoning in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and granted immunity to a rule adopted by the state supreme court banning the advertising of legal services. The measures, the Court held, "reflect a clear articulation of the State's policy with regard to profession-

---

4. "In the years since the decision in *Parker*, the Court has had occasion in several cases to determine the scope of the state action doctrine. It has never departed, however, from *Parker's* ba-sic reasoning." *Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984).

al behavior." The Court also found it significant that "the state policy is so clearly and affirmatively expressed and that the state's supervision is so active." 433 U.S. at 362, 97 S.Ct. at 2698. The Court in *Bates* stressed the difference between the facts of that case and the situation presented in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). In *Cantor* a state public utility commission approved a utility's practice of distributing light bulbs for no charge and passing the costs to consumers through their utility bills. The Court held that the commission's acquiesence in the program was insufficient to immunize the practice as state action. The Court found that the challenged program bore a remote relationship to the regulatory aims of the state, and, with respect to light bulb sales, there was no official state policy to displace competition.

In *Parker*, the anticompetitive conduct under attack was directed by the state legislature and supervised by state officers. In *Bates*, the rules in question were adopted by the state supreme court acting in its capacity as a legislative body with ultimate authority over the legal profession. In such cases, the challenged restraints are easily ascribed to the state as sovereign. Where the activity, however, "is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization," the application of the exemption requires a more searching analysis. *Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984). In these cases, the Court has required a showing that the challenged restraint is "one clearly articulated and affirmatively expressed as state policy." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). *See also, City of Lafayette v. Lou-*

isiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978); *Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 54, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982). The Court has also considered the degree to which the state "actively supervises" the policy. *Midcal Aluminum*, 445 U.S. at 105, 100 S.Ct. at 943; *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 110, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978). Thus, a state law authorizing wine suppliers to establish and enforce resale prices is not exempt if the state fails to exercise active supervision over the arrangements. *Midcal Aluminum*.

### B. Municipal Immunity.

In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court held that Congress did not intend to exempt cities from the antitrust laws merely because of their status as political subdivisions of the states. At issue was a challenge to the practices of utilities owned and operated by two cities. Justice Brennan, writing for a plurality, held that only municipal actions "pursuant to state policy to displace competition with regulation or monopoly public service" would be entitled to the exemption. 435 U.S. at 413, 98 S.Ct. at 1137. The Chief Justice, in a separate opinion, concurred with the plurality's holding that the activities under challenge were exempt only if they were the result of a state policy to displace competition. The Chief Justice reasoned, however, that such authorization was required because the cities were engaging in proprietary activities, implying that nonproprietary activities would be immune from antitrust attack without an inquiry into state policy. 435 U.S. at 423–26, 98 S.Ct. at 1142–43.

The split decision in *Lafayette* produced no little confusion among lower courts.[5]

---

**5.** "Of late the state action doctrine has become a road well-traveled by the Court. Its signposts, however, remain less than clear." *First American Title Co. v. South Dakota Land Title Ass'n*, 714 F.2d 1439 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

*See also Hybud Equipment Corp. v. City of Akron*, 654 F.2d 1187, 1195 (6th Cir.1981) ("It is difficult for us to apply the *Lafayette* decision since the plurality and dissenting opinions are each supported by four justices, and no line of reasoning commands a majority of the Court.").

Some of the questions raised in *Lafayette* were settled by the Court's decision in *Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). In that case, the plaintiff challenged a three-month emergency ordinance imposing a moratorium on the extension of cable television services in Boulder. The City claimed that the moratorium was a proper exercise of its home-rule powers. Justice Brennan, writing for a majority, affirmed *Lafayette's* holding that cities are not automatically immune from antitrust liability. The Court, moreover, rejected the City's argument that its actions were protected as an exercise of state sovereign power delegated to the City. For purposes of the *Parker* exemption, sovereignty is exclusively reserved to the state and cannot be transferred to a political subdivision. Municipalities, the Court held, "could partake of the *Parker* exemption only to the extent that they acted pursuant to a clearly articulated and affirmatively expressed state policy." *Id.* at 54, 102 S.Ct. at 842.

The City of Boulder maintained, in the alternative, that its actions were immune because the grant of home-rule powers by the state constitution met the requirement of "clear articulation and affirmative expression." This grant of authority, the City contended, demonstrated that the legislature "contemplated the kind of action" that was under attack. Again, the Court squarely rejected the City's position. The Court characterized the state's position as one of "mere neutrality." "A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions

for which municipal liability is sought." *Id.* at 55, 102 S.Ct. at 843. Accepting a general grant of legislative authority as a mandate for specific anticompetitive measures, the Court held, "would eviscerate the concepts of 'clear articulation and affirmative expression.'" *Id.* at 56, 102 S.Ct. at 843.

The *Boulder* decision clarified the basis of municipal immunity. Whether a city is entitled to the *Parker* exemption depends not upon the proprietary character of the city's actions or whether the action is within the general powers delegated to the city by the state. Immunity would attach only if the measures were taken pursuant to a "clearly articulated and affirmatively expressed" state policy. Left unresolved, however, were related issues of critical importance. The Court reserved the question of whether a city's actions must also satisfy the test of "active state supervision." [6] Further, although it is clear that home-rule powers alone are insufficient, the Court did not describe what degree of specific statutory authorization is necessary to invoke the exemption. [7]

## C. Immunity for State Agencies.

The plurality in *Lafayette* stressed that an exacting standard for municipalities was necessary to maintain economic order within a state and avoid a multitude of conflicts with national policy. "Serious economic dislocation" could result if each city were free to pursue its own parochial interests. 435 U.S. at 412–13, 98 S.Ct. at 1136. This emphasis on economic atomization within a state suggests that a different standard might apply to agencies with state-wide jurisdiction. [8] Arguably, an agency with

6. "Because we conclude in the present case that Boulder's moratorium ordinance does not satisfy the 'clear articulation and affirmative expression' criterion, we do not reach the question whether that ordinance must or could satisfy the 'active state supervision' test focused upon in *Midcal*." *City of Boulder*, 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14.

7. The Boulder decision could have a sweeping impact on the assertion of legislative authority by municipalities. Thirty-five states have made provisions for home-rule powers either through

legislation or through their constitutions. Note, *Community Communications Co. v. City of Boulder*, 31 De Paul L.Rev. 819, 821 (1982).

8. Although the *Lafayette* requirement of state authorization clearly applies to cities and other subordinate local units, its application to state agencies is uncertain. On the one hand, the majority's belief that "authorization" helps ensure that governmental activity is truly *state* action could logically be extended to state executive departments and administrative agencies. On the other hand, Justice

statewide powers, especially if it has authority to make policy, should not be required to show that its conduct was "pursuant to an affirmatively expressed and clearly articulated policy" to displace competition.

The Supreme Court discussed the standard applied to agencies in the recent case of *Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). There, the Court considered an antitrust attack on the grading of bar examinations by the Arizona Supreme Court's Committee on Examinations and Admissions. In a four-to-three decision, the Court held that the actions of the Committee were, for purposes of the exemption, those of the "state acting as sovereign." The Court's decision turned on the special relationship between the committee and the state supreme court. The state supreme court "retained strict supervisory power over the committee and ultimate full authority over its actions." *Id.*, 104 S.Ct. at 1997. Although the committee administered and graded the examinations, the "court itself approved the particular grading formula and retained the sole authority to determine who should be admitted to the practice of law in Arizona." *Id.* at 1998. Where such provisions are absent, the challenged action cannot be attributed to the actions of the state as sovereign and the agency must satisfy the standard applied to municipalities. "[T]he anticompetitive conduct of a nonsovereign state representative ... require[s] a showing that the conduct is pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation." *Id.* at 1995. The Court limited "sovereignty" to the state legislature and supreme court. The Court did not reach, however, the question of whether such sovereign authority may be attributed to the governor of a state. *Id.* at 1995 n. 17.

In the case at bar, the parties do not contend that OWDA is so closely related to a sovereign body that the actions of the agency may be attributed directly to the state as sovereign. Thus, OWDA's actions are protected by the exemption only if taken pursuant to a "clearly articulated and affirmatively expressed state policy" to displace competition. With that standard in mind, we turn to consider the district court's precise holding in the instant case.

## III.

### A. The District Court's Decision.

On remand, the district court held that the statutes governing the OWDA demonstrated a "clearly articulated and affirmatively expressed state policy" to displace competition. The court found that "the cooperative agreement and ordinance in the present case were clearly 'comprehended within the powers granted' by the state legislature" to OWDA. The state legislature's intent to displace competition was evinced by OWDA's authority "to finance waste disposal facilities and to enter into agreements to safeguard the financial interests of the respective governmental agencies." These provisions, the court held, provided a sufficient basis for the exemption; therefore, the court did not consider whether Akron's power under state law to regulate sanitation and waste disposal would satisfy the requirements for the exemption.

The OWDA was created to "provide for the comfort, health, safety, and general welfare of all employees and other inhabitants of the state ... through efficient and proper methods" of solid waste disposal. Ohio Rev.Code § 6123.03. To this end, OWDA is authorized to finance solid waste facilities through revenue bonds to pay for the costs of such projects. The district

---

Brennan's reasoning was predicated on the existence of a large number of municipalities and other subordinate governmental units, each pursuing parochial and perhaps conflicting policies. Their ordinances are locally formulated, with a possible anticompetitive im-

pact beyond city or district limits ... State agencies, by contrast, formulate statewide rules and policies.
Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 444 (1981).

court noted the following powers and duties of the OWDA:

For the purposes of Chapter 6123. of the Revised Code, the Ohio water development authority may:

. . . . .

(C) Make loans and grants to governmental agencies for the acquisition or construction of development projects by any such governmental agency and adopt rules and procedures for making such loans and grants;

. . . .

(F) Issue development revenue bonds and notes and development revenue refunding bonds of the state, payable solely from revenues as provided in section 6123.06 of the Revised Code, unless the bonds be refunded by refunding bonds, for the purpose of paying any part of the cost of one or more development projects or parts thereof;

. . . . .

(I) Make and enter into all contracts and agreements and execute all instruments necessary or incidental to the performance of its duties and the execution of its powers under Chapter 6123. . . .

. . . . .

(P) Do all acts necessary or proper to carry out the powers expressly granted in Chapter 6123. of the Revised Code.

Ohio Rev.Code § 6123.04. The OWDA may also contract with government agencies and private persons to fix the terms and conditions for the use or service of a facility financed by OWDA. The statute provides:

Any government agency or combination thereof may cooperate with the authority in the acquisition or construction of a development project and shall enter into such agreements with the authority as are necessary, with a view to effective cooperative action and safeguarding of the respective interests of the parties thereto, ... including, without limitation, ... contracting for the operation, leasing, or subleasing for such terms and with such person or governmental agen-

cy as maybe agreed upon .... The authority shall not enter into such a cooperative agreement with any governmental agency if the authority determines that the project to be acquired or constructed under the agreement would undermine the financial feasibility of an existing development project acquired or constructed under a cooperative agreement between the authority and another governmental agency because the proposed project would serve substantially the same geographic area as the existing project ....

Ohio Rev.Code § 6123.13.

The district court found it "unquestionable" that the legislature contemplated the "use of anti-competitive measures to ensure the financial viability of its waste disposal facilities." The court determined that OWDA's general authority to carry out powers expressly granted, that the agency's duty to protect its financial interests in development projects, and that the prohibition on the financing of facilities competing with existing projects demonstrated a clearly articulated and affirmatively expressed state policy to displace competition with regulation.

The district court relied on *Boulder* as authority for its holding that the ordinance and agreement under challenge were "clearly comprehended" within the powers granted OWDA. In *Boulder* the Court held that "the term 'granted' necessarily implies an affirmative addressing of the subject by the State." 455 U.S. at 55, 102 S.Ct. at 843. In *Boulder*, there was no specific grant of authority to regulate cable television from the state legislature; the city merely claimed the power under Colorado's Home Rule Amendment. By contrast, in the instant case there was a specific grant of power by the state to OWDA to operate in the area of waste disposal and recovery. This grant of authority, the district court ruled, satisfied the requirement that the challenged anticompetitive action result from a state policy.

## B. Analysis.

The validity of the district court's finding that OWDA's statutory mandate met the standard of a clearly articulated and affirmatively expressed state policy turns on a crucial ambiguity in *Lafayette* and *Boulder.* In those decisions the Court left unclear the degree of specificity in state law necessary to satisfy the standard applied to a nonsovereign state representative.[9] A municipality, the plurality held in *Lafayette*, is not necessarily required "to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense." However, there must be evidence that the state "authorized or directed a given municipality to act as it did." 435 U.S. at 414, 98 S.Ct. at 1137. It is clear, however, that merely having the legal authority to engage in the challenged activities is insufficient. The municipalities in *Lafayette* were authorized by state law to own and operate utilities, but this power standing alone did not protect the allegedly anticompetitive actions of those utilities. Likewise, the City of Boulder was empowered under state home-rule provisions to take the actions that were attacked under the antitrust laws. The city's power "to do as [it] please[s]," however, demonstrated only a "neutral" state policy regarding the ways and means that the city chose to exert its power. 455 U.S. at 55, 102 S.Ct. at 842.

OWDA's authority to engage in the actions under challenge is somewhere in between a specific state directive and a general, "neutral" grant of powers. Although OWDA may have the power to enter into the agreement now in issue, the statute clearly does not express a state preference for regulation—or monopolistic control—of waste disposal. OWDA's existence and function are perfectly consistent with a regime of open and free competition among private businesses that engage in waste disposal. Nothing in the statute declares a state policy regarding the organization of municipal waste disposal systems. As to the type of projects OWDA may finance—whether the projects monopolize or merely compete with private industry—the statute is silent. On the other hand, OWDA is authorized to promote the development of "safe and proper" waste disposal projects. To finance such developments, the agency is empowered to enter agreements "necessary or incidental" to the performance of its duties.

There is no question that a restraint which is expressly set forth in a legislative scheme for regulation is one that reflects a state policy to displace competition. *See, e.g., California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).[10] Where the restraint is not so expressed but is imposed by a nonsovereign state representative as an exercise of delegated pow-

**9.** We noted this problem in *Gambrel v. Kentucky Bd. of Dentistry,* 689 F.2d 612 (6th Cir. 1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983).

Because we believe the meaning of the statute in this case is clear and unambiguous, we need not decide a more subtle question, namely whether the interpretation of an ambiguous or open-ended regulatory statute by a state agency can ever constitute "state action" in and of itself under the *Parker v. Brown* doctrine. Certainly the first part of the *Midcal Aluminum* test, whether the challenged restraint is "clearly articulated and affirmatively expressed as state policy," at a minimum covers state policy explicitly declared in a statute. However, state regulatory statutes are often drafted in general terms and delegate broad policymaking discretion to a state regulatory agency. The result is administra-

tive policymaking, either by authorized rulemaking or by enforcement practices.
689 F.2d at 619 n. 3.

**10.** For example, in *Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 383 (7th Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984), the court upheld the exemption for a municipality that conditioned extension of sewer service on annexation. A state statute expressly provided that extension of sewer services could be refused if an adjoining area elected not be become annexed. In *Gambrel v. Kentucky Bd. of Dentistry,* 689 F.2d 612, 619 (6th Cir.1982), *cert. denied,* 459 U.S. 1208, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983), this court applied the exemption to protect a restraint on denture products where the challenged conduct was "compelled by the statute itself."

ers, the court must examine the relationship between the restraint and the regulatory aims of the state. If the challenged actions bear an attenuated relationship to the statutory aims and the express powers so delegated, the actions cannot be deemed to have resulted from a clearly articulated and affirmatively expressed state policy to displace competition. For example, public regulation of utilities is justified as necessary to protect consumers from exploitation by a natural monopoly. This justification, however, will not support regulation that reaches beyond the scope of a natural monopoly's powers into competitive markets. Absent express legislative direction for such a restraint, the regulation is not protected as state action under *Parker. Cantor v. Detroit Edison*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).[11]

If the challenged anticompetitive restraint of a nonsovereign state representative, for which there is no express statutory provision, is necessary to carry out the representative's mandate, then a legislative intent to displace competition may be inferred from the legislature's delegation of authority. In *Corey v. Look*, 641 F.2d 32 (1st Cir.1981), the plaintiff, a parking lot operator, brought an antitrust suit against a municipality and a public steamship authority. The plaintiff claimed that the town and authority had conspired to drive the plaintiff out of business in an effort to monopolize the market. The First Circuit held that the government bodies must demonstrate "by convincing reasoning that the challenged restraint is necessary to the successful operation of the legislative

scheme that the state as sovereign had established." This test was not satisfied by a showing that the authority was permitted, under state law, to purchase and operate parking lots. The law "simply empowers the Authority to behave as an ordinary competitive economic agent; we see no necessary anti-competitive implication." *Id.* at 37.

Requiring a showing of a necessary relationship, as in *Corey v. Look*, may place, in some circumstances, an unduly heavy burden on the state agency. An agency vested with broad discretionary powers will rarely find that only one course of action is available to accomplish its mission. Courts, moreover, are ill-equipped to determine in many cases whether a restraint was necessary in the strict sense implied by the court in *Corey v. Look*. Indeed, that decision may be explained on the grounds that the challenged actions—monopolization of parking lots—bore a tenuous relationship to the central mission of the steamship authority. The Supreme Court, moreover, has not required a showing of necessity, holding that an adequate expression of state policy may be found in "the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138.[12]

■ Our task, therefore, is to determine whether the restraints in question are a reasonable and foreseeable exercise of delegated powers within the scope of an agency's authority.[13] If the challenged re-

---

11. Similarly, state law authorizing a medical society to investigate charges of willful overcharging by physicians will not extend to justify society's efforts to enforce price-fixing. *Ratino v. Medical Service of Dist. of Columbia*, 718 F.2d 1260, 1268 (4th Cir.1983).

12. "[T]he state need not have contemplated the precise action complained of as long as it contemplated the kind of action to which objection was made." *Princeton Community Phone Book, Inc. v. Bate*, 582 F.2d 706, 717 (3rd Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978).

13. Professor Areeda, in an article prior to *Boulder*, writes:

*Lafayette* does not require that governmental acts be "compelled" or supervised by the state. Rather, it demands that the legislature have authorized the challenged activity with an intent to displace the antitrust laws. Unfortunately, state statutes seldom speak with clarity on either matter. In practice, therefore, express statements of authority or intent cannot be required. The Supreme Court has found it sufficient that "the legislature contemplated the kind of action complained of." A policy to displace the antitrust laws will then be inferred if the challenged restraint of

straints are reasonably related to an agency's express powers and reasonably designed to promote the state aims within a designated field of regulation, they can be found to result from a "clearly and affirmatively expressed state policy" to displace competition.[14]

Unlike the general guarantee of legislative autonomy in *Boulder*, OWDA's powers are expressly limited to the promotion of safe waste disposal systems. OWDA's exercise of this power, however, is restricted to the financing of waste treatment projects; it has no independent regulatory authority. The agency could not enforce the restrictive agreement now under challenge without the regulatory power of the City of Akron. Thus, OWDA's participation in a private scheme to monopolize a waste disposal market would not be entitled to the *Parker* exemption.

Although we cannot agree with the district court that the statutes governing OWDA meet the requirement of a clear and affirmative state policy, we find that the standard is satisfied by other considerations. OWDA's statutory mandate expressly provides that the agency may contract with other government agencies, including municipalities, to carry out state policy.[15] Under Ohio law, municipalities are expressly authorized to regulate the disposal of waste and construct facilities for the disposal of waste.[16] This authority is granted by statute and not merely claimed by virtue of constitutional home-rule powers as in *Boulder*. The Ohio courts, as the district court noted in its first decision in this suit, have held that a municipality may exercise this power through a monopoly. *See State ex rel. Moock v. Cincinnati*, 120 Ohio St. 500, 166 N.E. 583 (1929); *City of Canton v. Van Voorhis*, 61 Ohio App. 419, 22 N.E.2d 651 (1939).

We find that the ordinance and agreement under challenge bear a reasonable relationship to the state policy promoted by OWDA and the express powers delegated to OWDA and Akron. The ordinance is limited in scope to the collection and disposal of solid waste, and its promulgation was an essential element of a plan to carry out OWDA's statutory mandate.

competition is a necessary or reasonable consequence of engaging in the authorized activity.
Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 445–46 (1981). *See also* P. Areeda, Antitrust Law, ¶ 212.3 (Supp.1981).

**14.** Several courts have adopted this approach. In *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983), *petition for cert. filed*, 52 U.S.L.W. 3039 (U.S. July 25, 1983) (No. 83–138), the court considered a challenge to a city's decision to grant a contract for exclusive ambulance services within the city to a single operator. The court held that a "sufficient state policy to displace competition exists if the challenged restraint is a necessary or reasonable consequence of engaging in the authorized activity." State law permitted the city to contract with "one or more" ambulance operators. The court held that the city's actions were protected by the exemption because monopoly service is "the necessary consequence of having only one municipal ambulance operator." 705 F.2d at 1013. *Accord First American Title Co. v. South Dakota Land Title Ass'n*, 714 F.2d 1439, 1454 (8th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). *See also Benson v. Arizona State Bd. of Dental*

*Examiners*, 673 F.2d 272 (9th Cir.1982) (anti-competitive restraints contemplated by statutes creating a licensing board to regulate the practice of dentistry); *Euster v. Eagle Downs Racing Ass'n*, 677 F.2d 992, 995 (3rd Cir.), *cert. denied*, 450 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982) (imposition of a fee on jockeys by public agency is necessary to accomplish legislative goals of regulation of horse racing.).

**15.** OWDA is expressly authorized to enter into cooperative agreements with government agencies for the financing of development projects. The term 'government agency' includes any county, town, or municipality of the state. Ohio Rev.Code Ann. § 6123.01(A).

**16.** Ohio Rev.Code Ann. § 715.43 provides:
Any municipal corporation may provide for the collection and disposition of sewage, garbage, ashes, animal and vegetable refuse, dead animals, and animal offal, and may establish, maintain, and regulate plants for the disposal thereof.
Ohio Rev.Code Ann. § 717.01 provides:
Each municipal corporation may:
(C) Erect a crematory or provide other means for disposing of garbage or refuse, and erect public comfort stations ....

OWDA's reliance on the statutory authority of a municipality to regulate—even by monopoly—the disposal of refuse was a foreseeable result of the legislative grant of power to contract with municipalities. We hold, therefore, that the statutory delegation of regulatory power to the City conjoined with the powers and aims of OWDA satisfy the requirement that the challenged actions result from a clearly articulated and affirmatively stated policy to displace competition.

Our holding is consistent with that of the Seventh Circuit in *Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency,* 715 F.2d 419 (8th Cir.1983), *petition for cert. filed,* 52 U.S. L.W. 3441 (U.S. Nov. 18, 1983) (No. 83-825), a case strikingly similar to the one now before us. In that case, several municipalities joined together to establish an agency, "Metro," to issue revenue bonds for the construction of a modern waste disposal facility. On the recommendation of a bond consultant, the municipalities covenanted for the benefit of bond holders that all waste generated within their jurisdictions would be processed at the facility. An operator of a sanitary landfill outside the jurisdiction of the new plant brought suit, alleging that the cities had attempted to illegally monopolize the market for waste disposal. The court held that the restriction was protected by the state action exemption.

The court noted that, while statutes authorized the creation of agencies such as Metro, no statute indicated that the state legislature actually contemplated that a facility financed by such an agency would have an exclusive right to dispose of waste. *Id.* at 426. However, the court found authorization for the restriction in the broad authority granted such agencies by the state legislature.

We believe that the Iowa legislature did indeed contemplate these restrictions on competition. [A statutory provision] expressly authorizes municipalities to finance collective projects by issuing revenue bonds. When ascertaining what was in the minds of the legislators, we cannot ignore the realities of the municipal bond market in the mid–1970s.... Common sense and experience suggest that the Iowa legislature must have intended Metro to have the latitude necessary to promote the sale of the bonds.... In short, even though the legislation does not speak to the precise question whether restraints of trade could be employed to guarantee the financial vitality of Metro, the comprehensive legislative scheme favoring the development of solid waste facilities demonstrates that the legislature intended the localities to have broad authority to act in furtherance of the legislative mandate. Thus, we believe that the restraint on competition was a "necessary or reasonable consequence" of engaging in the authorized activity of constructing a waste disposal facility with funds raised by revenue bonds.

715 F.2d at 427. The court distinguished the case from *Boulder.* The Iowa legislature had provided that municipalities could join together to create agencies such as Metro. Such an agency could satisfy a municipality's duty to provide sanitary facilities for the disposal of solid waste. By contrast, in *Boulder* there was no reference in state law to the types of industry to be regulated under Colorado's home-rule provision.

We agree with the reasoning in *Central Iowa Refuse Systems, Inc.,* that a state's broad authorization for the financing of waste facilities is not a "neutral" grant of powers as in *Boulder.* Where, as in the instant case, there is a reasonable exercise of that authorization within a municipality's statutory power to regulate waste disposal, we are satisfied that the restraint is pursuant to the clear articulation and affirmative expression of state policy required by precedent.

## C. Active State Supervision.

As noted earlier, the Supreme Court has not yet determined whether a municipal ordinance that satisfies the criterion of "clear articulation and affirmative expres-

sion" must also meet the requirement of active state supervision to be entitled to the state action exemption. *See Boulder*, 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14. The several circuits that have considered this issue have held that active state supervision is not necessary where the challenged activity is within a traditional function of a municipality. *See Golden State Transit Corp. v. City of Los Angeles*, 726 F.2d 1430 (9th Cir.1984); *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983), *petition for cert. filed*, 52 U.S.L.W. 3039 (U.S. July 25, 1983) (No. 83–138); *Town of Hallie v. City of Eau Claire*, 700 F.2d 376 (7th Cir.1983), *cert. granted*, — U.S. —, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984).

The requirement of active state supervision had its greatest force in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In that case, a state statute authorized wine wholesalers to file price schedules, and retailers were required to comply with those prices. These price controls were clearly imposed by state law, but the state exercised no control or supervision over the system. Although the restraints resulted from an undeniable state policy to displace competition, the Court held that the activities were not protected by the exemption because of the absence of active state supervision over the regulatory scheme.

The fact that the price restraints at issue in *Midcal* were established by private parties lead some courts and commentators to conclude that the requirement of active state supervision was limited to the activities of private parties.[17] In *Midcal* the Court seemed primarily concerned with the risks of private abuse of state-created reg-

ulatory schemes.[18] This danger is diminished where the challenged activities are undertaken by state agencies that are not tempted by private gain. Requiring active state supervision may also undermine the traditional functions of self-governing municipalities. Imposing such a requirement on municipalities, one court declared, "would erode the concept of local autonomy and home rule authority." *Town of Hallie v. City of Eau Claire*, 700 F.2d at 384.

While there are reasons in logic and in policy for the distinction between state and private actors, there is slight support for such a position in the opinions of the Supreme Court. In its most recent discussion of the requirement, *Hoover v. Ronwin*, the Court made no distinction between state and private actors, referring only to the activities of a "nonsovereign state representative." The Court stated that the "degree to which the state legislature or supreme court supervises its representative is relevant" to a determination of whether the conduct is protected by the *Parker* exemption. 104 S.Ct. at 1995. In *Bates v. State Bar of Arizona*, the Court noted that the restraint under attack was subject to pointed reexamination by the state supreme court, a fact that the Court characterized as active state supervision. 433 U.S. at 362, 97 S.Ct. at 2698.

The Court in *Hoover v. Ronwin* mentions supervision by the state legislature or supreme court. Yet, where the inquiry is relevant, it would be extremely impractical to limit "active state supervision" to the oversight by those bodies. By necessity, actual supervision must be delegated to subordinate officials. In *Parker*, the price support system was administered by the state's director of agriculture and a com-

17. *See Central Iowa Refuse Sys. v. Des Moines Metropolitan Solid Waste Agency*, 715 F.2d 419, 428 (8th Cir.1983), *petition for cert. filed*, 52 U.S.L.W. 3441 (U.S. Nov. 18, 1983) (No. 83–825); *Town of Hallie v. City of Eau Claire*, 700 F.2d 376 (7th Cir.1983), *cert. granted*, — U.S. —, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984). *See also* Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 445 (1981);

Rogers, *Municipal Antitrust Liability in a Federalist System*, 1980 Ariz.St.L.J. 305, 340–42.

**18.** In *Midcal* the Court concluded: "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what it essentially a private price-fixing arrangement." 445 U.S. at 106, 100 S.Ct. at 943.

mission appointed by the governor. In *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the Court applied the exemption to protect a state's automobile franchise act from a challenge under the antitrust laws. The law permitted existing franchisees to block the establishment of new competitors merely by filing a complaint with a state board, which would permit entry thereafter upon a showing of good cause. The act itself was a system of regulation clearly designed to displace competition. The interim restraints imposed by the objections of existing franchisees, the Court noted, were subject to the board's "ongoing regulatory supervision." 439 U.S. at 110, 99 S.Ct. at 412.

We believe that it is unnecessary and inappropriate in this case to establish strict rules setting forth the circumstances requiring rigorous application of the test of state supervision. Where a suit challenges the particular exercise of state power, the court should consider the nature and extent of supervision by the state as part of the general inquiry into whether the challenged actions are those of the state as sovereign. *See Hoover v. Ronwin.* The court should give close scrutiny to the existence of supervision where the circumstances indicate the possibility of an improper exercise of that power. *See New Motor Vehicle Bd.; Midcal Aluminum.*

We find that the participation of OWDA in the agreement and in the continued operation of the RES satisfies the concerns underlying the test of active state supervision. OWDA's participation in the agreement insures that the exclusive rights granted the facility were designed to meet the legislative goals set forth in OWDA's mandate. As the district court noted, the cooperative agreement requires periodic reporting to OWDA and authorizes the agency to assume operating responsibility for the RES should the City fail to meet its obligations under the agreement. OWDA's interest and duty to protect the bond owners is an important safeguard against the abuses that motivated the decision in *Midcal.*

For the foregoing reasons, the judgment of the district court is AFFIRMED.

MERRITT, Circuit Judge, concurring.

I agree with the Court's holding and its reasoning in this case in full: the financing authority for solid waste projects expressly granted to the Ohio Water Development Agency, when joined with the city's expressly granted authority to regulate garbage disposal, establishes a clearly expressed state policy permitting a municipal monopoly over garbage disposal. I agree also that the state supervision requirement is met by the Water Development Agency's authority to enforce its contract with the city requiring the displacement of competition.

In addition, it seems to me that the city's powers, standing alone, are sufficient to satisfy the state action exemption. The State Legislature in Ohio has expressly granted to the city the authority to "regulate" garbage disposal, including the authority to "establish" and "maintain" garbage disposal plants. The Legislature has delegated to the chief legislative body of the city the power to set policy on waste disposal and to oversee the implementation of that policy. The Legislature gives the city both the power to go into the garbage disposal business itself and the power to control competitors by law—hence the power to monopolize. This state delegation to the local legislative body of the power to monopolize and the power to implement and oversee the operation of the monopoly is sufficient to satisfy the "active state supervision" aspect of the state action test as well as the state delegation aspect.